**In re IONOSPHERE CLUBS, INC. and Eastern Air Lines, Inc., Debtors.**

**EASTERN AIR LINES, INC., Plaintiff,**

**v.**

**INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, AFL–CIO ("IAM"), et al., Defendants.**

**Bankruptcy Nos. 89 B 10448 (BRL), 89 B 10449 (BRL).
Adv. No. 89–5532A.**

United States Bankruptcy Court,
S.D. New York.

Nov. 29, 1989.

Siff, Rosen & Parker, P.C., New York City (Mark S. Landman, William G. Ballaine, Amy Gallent, of counsel), for plaintiff.

Vladeck, Waldman, Elias. & Engelhard, P.C., New York City (Sheldon Engelhard, Larry Cary, Hanan B. Kolko, Ivan D. Smith, of counsel), Guerrieri, Edmond & James, Washington, D.C., for IAM.

Cohen, Weiss and Simon, New York City (Peter Herman, Richard N. Gilberg, of counsel), for ALPA and Henry A. Duffy.

O'Donnell & Schwartz, New York City (Malcolm A. Goldstein, Asher W. Schwartz, of counsel), for TWU, Local 553.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BURTON R. LIFLAND, Chief Judge.

Based upon the lengthy record as presented at the hearings which were commenced back in March 1989 continuing until April 5, when a settlement agreement was placed on the record, and then recommenced in July, 1989 and concluded on October 4, 1989, the testimony of over 75 witnesses adduced at the hearings which produced approximately 4,000 pages of

transcript, and after reviewing hundreds of pages of exhibits, hours of videotapes, the pleadings, the credibility of the witnesses including the numerous witness/members of the general public unaffiliated with the parties to this dispute, the probity of the testimony and based upon all the submissions of the parties; this Court makes the following Findings Of Facts And Conclusions Of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure (the "Federal Rules") made applicable herein pursuant to Bankruptcy Rule 7052.

## I. FINDINGS OF FACT

### A. THE PARTIES

1. Plaintiff Eastern Air Lines, Inc. ("Eastern") is a major U.S. commercial passenger airline. Eastern employed approximately 30,000 people on March 3, 1989 and served numerous U.S. and foreign cities.

2. Defendant International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM") is an unincorporated association organized for the purposes or objectives of a labor organization. Its principal office is located at 1300 Connecticut Avenue N.W., Washington, D.C. Defendant IAM is organized in various divisions, has offices in various locations throughout the United States, and does business in the States of New York, Georgia and Florida. Prior to the strike, the IAM was the collective bargaining representative for approximately 9,000 mechanics, ground service personnel, and other employees of Eastern. (Amended Complaint ¶ 3; IAM Amended Answer ¶ 3; April 4 Tr.[1] 157, 202.)

3. Defendants District Lodge 100 ("District Lodge") and Local Lodge 1018 ("Local Lodge 1018") of the International Association of Machinists & Aerospace Workers, AFL–CIO are unincorporated associations affiliated with the IAM. Their principal places of business are 3026 N.W. 79th Avenue, Miami, Florida, and 2369 Louis Kossuth Avenue, Ronkonkoma, New York, respectively. (Amended Complaint ¶ 4; IAM Amended Answer ¶ 4; August 8 Tr. 1815).

4. Defendant Local Lodge 1690 ("Local Lodge 1690") of the International Association of Machinists & Aerospace Workers, AFL–CIO is an unincorporated association affiliated with the IAM. Its principal place of business is 4362 Thurmond Road, Forest Park, Georgia 30050. (Amended Complaint ¶ 5; IAM Amended Answer ¶ 5; August 8 Tr. 1815.)

5. The following defendants are officers or representatives of defendant IAM: C.E. Bryan, President and General Chairman; Leroy Washington, General Chairman, IAM District 100; Peter Voccola, IAM LaGuardia Airport, Acting Chief Shop Steward; A. James Gaetaniello, President, IAM Local Lodge 1018; Robert D. Taylor, General Chairman, IAM District 100; Charles Pica, General Chairman, IAM District 100; Tom Hall, IAM LaGuardia Airport Shop Steward; Julius Scott, IAM LaGuardia Airport Shop Steward, Bruce Sobczak, IAM LaGuardia Airport Shop Steward; James Dunn, IAM Shop Steward; Edward Santini, IAM LaGuardia Airport Chief Shop Steward; Angel Garcia, IAM LaGuardia Airport Shop Steward; and John Ciglar, IAM LaGuardia Airport Shop Steward. (Amended Complaint ¶ 6, IAM Amended Answer ¶ 6; August 8 Tr. 1815).

6. Defendant Air Line Pilots Association, International ("ALPA") is an unincorporated association organized for the purposes or objectives of a labor organization. Its principal office is located at 1625 Massachusetts Avenue N.W., Washington, D.C. 20036. Defendant ALPA is organized in various divisions, has offices in various locations throughout the United States and does business in the State of New York. ALPA is the collective bargaining representative for the Eastern pilots. (Amended Complaint ¶ 7; August 8 Tr. 1815.)

7. Defendant ALPA's Master Executive Council ("MEC") for the Eastern pilots is ALPA's agent responsible for conducting labor relations on behalf of the Eastern pilots represented by ALPA. (August 8 Tr. 1915). The Eastern MEC is composed of the 17 representatives from the six Lo-

---

**1.** For the purpose of edification, the following abbreviations will be used herein: Transcript ("Tr."); Plaintiff's Exhibit ("PX [ ]"); IAM's Exhibit ("IAM [ ]"); ALPA's Exhibit ("ALPA [ ]").

cal Executive Councils ("LEC") and a Chairman, Vice–Chairman, and Secretary–Treasurer. Eastern MEC's principal office is 201 Madeira Avenue, Coral Gables, Florida. (ALPA Answer ¶ 8; August 8 Tr. 1815).

8. Defendant ALPA is further organized into various councils. (ALPA Answer ¶ 9). Eastern's ALPA-represented pilots are organized into seven councils at Eastern's pilot base cities of which the pertinent base cities are Atlanta (Council 7), Miami (Council 18) and New York City (Council 51). Each council is composed of all ALPA-represented Eastern pilots based in that city. Each council elects a LEC, consisting of three representatives, one for each pilot status (*i.e.*, a captain representative, a first officer representative and a second officer representative). (August 8 Tr. 1815.) ALPA has also organized smaller units, called blocks, to facilitate communication with its members (August 23 Tr. 2666, 2673–2674), and the staffing of picket lines. (August 30 Tr. 2965–2966).

9. The national headquarters of ALPA maintains close communications with its councils and offers advice and support to them. The national headquarters, through its national strike committee, instructs its councils on appropriate conduct during a strike (August 15 Tr. 2119), has developed guidelines in the form of a strike manual to govern this behavior (August 15 Tr. 2120; PX 43; ALPA A), receives copies of the daily faxes sent out by the Eastern MEC (August 15 Tr. 2126–2127) and provides supplies necessary to conduct strike activities, such as picket signs. (August 17 Tr. 2430.) The councils, in turn, provide the national headquarters with information on aircraft movement collected by their observers. (August 21 Tr. 2596.)

10. The following defendants presently are or at relevant times were officers or representatives of defendant ALPA; Henry A. Duffy is President of ALPA; John J. Bavis, Jr. was Chairman of Eastern MEC; Daniel J. Vician is Vice–Chairman of Eastern MEC; Raymond H.S. Wright is Secretary/Treasurer of Eastern MEC; Ronald Cole is Chairman of the Media Relations Committee of Eastern MEC; Joseph P. Distel is a member of the ALPA Council 7 LEC; Wright B. George is a member of the ALPA Council 7 LEC; Charles H. Copeland is a member of the ALPA Council 51 LEC; Albert J. Gallo is a member of the ALPA Council 51 LEC; Ricky L. Chapman is a member of the ALPA Council 51 LEC; Robert A. Breslin is a member of the ALPA Council 18 LEC; Bruce F. Cushing is a member of the ALPA Council 18 LEC; and James C. Bost, Jr., is a member of the ALPA Council 18 LEC. (Amended Complaint ¶ 10, ALPA Answer ¶ 10; August 8 Tr. 1815.)

11. Defendant Transport Workers Union of America ("TWU") is an unincorporated association organized for the purposes or objectives of a labor organization. Its principal office is located at 656 Mineola Drive, Miami Springs, Florida 33166. Defendant TWU is organized into various divisions, has offices in various locations throughout the United States, and does business in the State of New York. The TWU is the collective bargaining representative of the Eastern flight attendants. (August 8 Tr. 1915.)

12. Defendant TWU's Local Union 553 ("TWU Local 553") is TWU's agent responsible for conducting labor relations on behalf of Eastern flight attendants represented by the TWU. Local 553 is located throughout the country at Eastern's flight attendants' base cities, of which the pertinent base cities are:

(i) 1001 Virginia Avenue
Suite 322C Hapeville, GA 30343
(404) 766–1410

(ii) 80 West End Avenue
Room 554
New York, NY 10023
(212) 595–7550

(August 8 Tr. 1815; TWU Answer ¶¶ 3, 4.)

13. The following defendants are officer or representatives of defendant TWU: Mary Jane Barry is President of TWU Local 553; Nancy Currier Tauss is Vice–President of TWU Local 553; Judith A. Coughlin is Secretary/Treasurer of TWU Local 553; Pattie O'Donnell is Chairperson of TWU Local 553, Atlanta Section; Carol Chappell is Vice–Chairperson of TWU Local 553, Atlanta Section; Terry Owen is Secretary of TWU Local 553, Atlanta Sec-

tion; Carmen Gonzalez is Chairperson of TWU Local 553, New York Section; Michael Stubbins is Vice–Chairperson of TWU Local 553, New York Section; Kathy Ferar is Vice–Chairperson of TWU Local 553, Miami Section and Kit Rafferty is Vice–Chairperson of TWU Local 553, Miami Section. (August 8 Tr. 1815.)

14. Hereafter, the term "IAM Defendants" shall refer to defendants described in ¶¶ 2–5 hereof, the term "ALPA Defendants" shall refer to defendants described in ¶¶ 6–10 hereof, and the term "TWU Defendants" shall refer to defendants described in ¶¶ 11–13 hereof (Collectively, the "Defendants").

## B. THE UNDERLYING DISPUTE

15. Eastern and defendant IAM have for many years been parties to collective bargaining agreements entered into pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.*, fixing, among other things, rates of pay, rules, and working conditions of Eastern's employees in the crafts represented by the defendant labor organization. (Amended Complaint ¶ 16; IAM Amended Answer ¶ 16.)

16. Eastern and IAM were parties to a collective bargaining agreement executed May 16, 1985 (the "Agreement"), which established rates of pay, rules, and working conditions for the mechanics and other employees of Eastern represented by IAM. That Agreement expired by its terms on December 31, 1987, but the status quo provisions of the RLA required that both Eastern and the IAM continue to honor its terms until they had exhausted the extended bargaining procedures of the RLA. (Amended Complaint ¶ 17; IAM Amended Answer ¶ 17.)

17. Eastern and the IAM began negotiating for a new collective bargaining agreement in October 1987. Beginning in January 1988, the parties were assisted in the negotiation process by the National Mediation Board ("NMB"), pursuant to § 6 of the RLA, 45 U.S.C. § 156. More than a year later, on February 2, 1989, the NMB concluded that mediation had been unsuccessful and terminated its services, thereby commencing a 30–day statutory cooling-off period after which Eastern and IAM were freed from the status quo procedures of the RLA and entitled to exercise economic self-help. (Amended Complaint ¶ 18; IAM Amended Answer ¶ 18.)

18. Eastern's financial condition was bleak even before mediation began and badly deteriorated during the protracted period during which the requirements of the RLA obligated Eastern to maintain the status quo. Having lost more than $1 billion from 1980 through 1987, Eastern suffered a net loss of over $355 million in 1988 alone, and another $225 million in the first quarter of 1989.

19. Defendants' own expert, Farrell Kupersmith, conceded in August 1988, in connection with another litigation, that without major changes, Eastern would lose $200 to $250 million annually. (August 8 Tr. 1843–1844; PX 39; PX 40 *ALPA v. Eastern Air Lines, Inc.*, 863 F.2d 891, 893 (D.C.Cir.1988).)

20. Eastern's proposed changes in pay, rules, and working conditions for IAM-represented employees were projected to save $147 million over the life of the agreement being bargained, yet because of the status quo requirements of the RLA, Eastern could not implement these changes during the lengthy mediation process required by law. (August 8 Tr. 1841.)

21. During the entire mediation process, the IAM never offered to accept any cuts in the then existing wage scales. In stark contrast, ALPA and TWU had agreed to 20 percent wage cuts when they had negotiated their collective bargaining agreements with Eastern in 1985 and 1986. (August 8 Tr. 1821–1822.) Eastern's former Director of Labor Relations, Paul Priest, sent the IAM's President and General Chairman of District 100, Charles Bryan, over 300 letters regarding proposed changes to the IAM contract. Mr. Priest never received a response to any of those proposals. The IAM's initial position was that no matter what Eastern's proposal was regarding a reduction in wages, the IAM would seek an amount identical to that in increases. For example, if Eastern

wanted to reduce wages for baggage personnel by 33⅓%, the IAM would demand 33⅓% as an increase. Because Eastern only sought a 7 or 8% reduction for skilled mechanics, the IAM responded with a demand for a 7 or 8% increase. Thus, the IAM's initial negotiating position would mean that skilled mechanics would earn less than unskilled baggage personnel. Even after moving away from this position, the IAM never was willing to accept a salary reduction despite the fact that, as noted above, their own expert conceded in another litigation that Eastern needed major changes to avoid losses of $200 to $250 million. Quite to the contrary, they demanded an increase. Eastern proposed a relatively modest reduction for skilled mechanics and a larger reduction for unskilled employees, who were making approximately $15 per hour. However, this was accompanied by a company proposal for a skills training program for the unskilled employees so that, at company expense, they could qualify for the higher paying skilled mechanic positions. These proposals were tailored to Eastern's financial needs and, on an overall basis, were comparable to the concessions previously made by the other Eastern unions. The record supports the finding that Eastern's proposals were the product of good faith bargaining; indeed the IAM offered no evidence to the contrary. (August 8 Tr. 1814, 1817–1825, 1855; PX 33.)

22. Before formally terminating its services, the NMB asked Eastern if it would voluntarily agree to arbitration, pursuant to § 7 of the RLA, 45 U.S.C. § 157. Based upon the extensive record submitted, this Court determines that Eastern made a reasonable, good faith decision to decline the NMB's offer to submit the dispute to binding arbitration, as was its right under the RLA. Eastern's conclusion that the economic issues were so fundamental to its survival that it could not afford to have them determined by third parties has not been rebutted by Defendants. Moreover, had it agreed to binding arbitration, it would have faced the costly prospect of having to delay further any changes in its rates of pay, rules, and working conditions

pending completion of that process, which reasonably could have been expected to consume at least another four to six months, if not longer. (August 8 Tr. 1830–1834, 1854–1855; PX 36; PX 37.)

23. The IAM formally advised the NMB that it would accept binding arbitration, but only after it was aware Eastern had declined arbitration. Moreover, the IAM had begun elaborate strike preparations at least one year before Eastern declined to settle the dispute by arbitration, and the IAM had, itself, rejected arbitration of its 1983 dispute with Eastern. (August 8 Tr. 1830, 1835–1838; PX 30; PX 38.) There is no persuasive evidence the IAM would have agreed to arbitrate the current dispute if Eastern had notified the NMB that it was prepared to do so.

24. Following rejection of arbitration, defendant IAM threatened to strike Eastern unless Eastern agreed to its contract proposals prior to the expiration of the statutory cooling-off period at 12:01 a.m. (EST), March 4, 1989. (Amended Complaint ¶ 19; IAM Amended Answer ¶ 19.) Nonetheless, Eastern continued to negotiate with the IAM in an effort to avert the strike. (August 8 Tr. 1817–1820.)

25. As the labor dispute threatened substantially to interrupt interstate commerce, the NMB, pursuant to § 10 of the RLA, then recommended to President Bush that he create a Presidential Emergency Board to issue findings on and facilitate a settlement of the dispute. Eastern opposed this recommendation asserting that it would have further delayed Eastern's need to stem losses and achieve immediate savings by finally implementing changes in pay, rules and work conditions. (August 8 Tr. 1817–1820.)

26. On March 3, 1989, the eve of the strike deadline, the President of the United States refused to appoint a Presidential Emergency Board pursuant to § 10 of the RLA, 45 U.S.C. § 151, et seq., to examine the issues and draft recommendations to resolve the dispute.

27. The parties were unable to reach an agreement by the strike deadline and, ef-

fective March 4, 1989, Eastern unilaterally implemented its proposals for a new labor agreement for IAM-represented employees, as it was permitted to do by law. (Amended Complaint ¶ 20; IAM Amended Answer ¶ 20.)

28. True to its declaration of intent, the IAM struck Eastern at 12:01 a.m. (EST), March 4, 1989, and IAM pickets appeared at LaGuardia Airport in Queens, New York, and Hartsfield International Airport in Atlanta, Georgia, as well as any many other locations. (Amended Complaint ¶ 21; IAM Amended Answer ¶ 21.)

29. Members of ALPA and TWU were directed by their respective Unions to honor the IAM picket lines and not report to work as scheduled at Eastern. (August 15 Tr. 2122–2123; August 30 Tr. 2967; PX 43.) ALPA and TWU members were also directed to participate in picketing and demonstrations. (July 17 Tr. 33, 54–55, 93–94, 101–102.) Such honoring of picket lines is commonly known as a "sympathy strike." ALPA's sympathy strike has been declared to be lawful under the RLA. (*Eastern Air Lines v. Air Line Pilots Ass'n, Intern,* 710 F.Supp. 1342 (S.D.Fla. 1989), *aff'd,* 89–5229 (11th Cir. June 7, 1989)[2].

30. On March 9, 1989, as a result of the strike, Eastern and its affiliate, Ionosphere Clubs, Inc. ("Ionosphere"), each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code") because Eastern does not have the financial resources to survive this strike without Court protection. (Amended Complaint ¶ 23; IAM Amended Answer ¶ 23.)

31. Since the Petition Date, Eastern and Ionosphere have continued to operate their businesses and manage their properties as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Code.

32. Since the strike, Eastern has continued to operate its airline by utilizing employees who chose not to strike, management personnel, subcontractors and, where necessary, replacement employees. (Amended Complaint ¶ 22.)

33. Eastern also has participated in good faith negotiations with ALPA and TWU and has stood ready to negotiate with the IAM, despite the ongoing strike. (August 8 Tr. 1817–1818.)

34. Given Eastern's dire financial condition, the Court finds that prior to commencing this proceeding for injunctive relief, Eastern made every reasonable effort to settle its dispute with the IAM by negotiation or with the aid of available governmental machinery or mediation or voluntary arbitration.

35. The *illegal* conduct complained about by Eastern in this proceeding is not a direct result of Eastern's declination of the offer to arbitrate.

36. The relationship between the three Unions and Eastern is a matter of major importance and its resolution is of central concern to the administration of the estate.

## C. PRIOR PROCEEDINGS HEREIN

37. In March, this Court conducted an evidentiary hearing on Eastern's application for a temporary restraining order ("TRO") and for an award of monetary damages from Defendant for damages suffered to date. Based on the evidence, a TRO was issued on March 22, 1989 against a number of the IAM Defendants named herein to restrain certain demonstrated illegal conduct. Thereafter, a hearing was held on Eastern's motion for a preliminary

---

**2.** It should be noted that subsequent to the conclusion of the trial, both ALPA and TWU have terminated their sympathy strike. Such an event moots the need to issue a preliminary injunction enjoining both ALPA's and TWU's future illegal conduct at this time. Accordingly, the accompanying Preliminary Injunction Order is confined to the IAM and those defendants related to it. However, as Eastern's Amended Complaint requests an award of monetary damages from Defendants for damages suffered to date in addition to injunctive relief, and because the wrongs alleged may be capable of repetition yet evading review, the termination of the sympathy strike does not obviate the need to issue the *Findings Of Fact And Conclusions Of Law* herein as against these Defendants. *See, e.g., Air Line Pilots Ass'n Int'l v. Transamerica Airlines,* 817 F.2d 510, 512 n. 1 (9th Cir.1987); *see also, Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982).

injunction. The preliminary injunction hearing continued until April 5, when a settlement agreement was placed on the record by the litigants governing specified IAM activities. (April 5 Tr. 3–6.) At the IAM counsel's insistence, the agreement was not "so ordered" by this Court, but was a conditioned settlement, without prejudice to Eastern's right to reopen the proceedings if the agreement was breached or if other problems developed. It was understood that if the proceedings were reopened, evidence adduced prior to settlement would be deemed part of the record. (April 5 Tr. 6.) [3]

38. After April 5, there were repeated instances in which the IAM Defendants violated the agreement, and despite efforts by counsel to resolve these problems, on July 17 it became necessary for Eastern to make an application to this Court to renew the proceeding, expand it to cover other illegal conduct at LaGuardia and elsewhere, and to add the ALPA and TWU Defendants ("Eastern's Amended Complaint"). Following an evidentiary hearing on July 17, this Court issued a TRO against the IAM, ALPA and TWU Defendants restraining illegal activities at LaGuardia Airport in Queens, New York and at Hartsfield International Airport in Atlanta, Georgia. (July 17 Tr. 150–53.) On July 24, this Court commenced the preliminary injunction hearing which concluded on October 4. The hearings were often conducted late into the evening. The Court has, at times, granted the Parties' requests for brief adjournments of the hearing to accommodate their witnesses or their counsel. Pending completion of the hearing and the issuance of these Findings Of Facts And Conclusions Of Law, the TRO has remained in effect throughout this time.

39. Initially, the TRO had a dampening effect on Defendants' illegal activities. However, as demonstrated below, the TRO has not stopped Defendants from continuing their illegal activities, which, if anything, have escalated. This indicates the need for additional, specifically-drawn injunctive provisions crafted to bring an end to all illegal conduct without violating Defendants' statutory and constitutional rights.

### D. ILLEGAL ACTIVITIES AT AND NEAR LaGUARDIA AIRPORT

40. Specific examples of the illegal tactics at or near LaGuardia Airport, directed at Eastern's employees, customers, and other persons, and designed to disrupt Eastern's flight operations and its business, are set forth in the paragraphs that follow.

*Obstruction*

41. In connection with the IAM strike against Eastern at LaGuardia Airport, the Port Authority, by agreement with the IAM's attorney and John DePaolo, IAM's Chief Shop Steward, has authorized a total of 24 picketers outside the Eastern Air Lines Shuttle Terminal, 12 picketers outside the entrance to the Eastern employee parking lot (Post 2), 12 picketers on the upper level of the Central Terminal and 12 picketers on the lower level at the Central Terminal. (March 29 Tr. 78–80; April 4 Tr. 41, 97, 100, 105.)

42. The Unions have frequently violated the Port Authority's limitations on the number of picketers. The IAM concedes that such violations have occurred. Moreover, the IAM and ALPA admittedly do not attempt to coordinate picketing activities with each other or TWU to prevent violations of the Port Authority's numerical limits. (August 15 Tr. 2094–2095; August 24 Tr. 2831–2832.)

43. During the strike, the Unions and their members and supporters have been involved in mass picketing [4] of Eastern's facilities at LaGuardia Airport. The purpose of the Unions' mass picketing and related activities has been to shut Eastern down by storming Eastern's facilities, dis-

---

**3.** Evidence adduced on or before April 5, therefore binds only the IAM defendants who were party to the initial stages of the hearings.

**4.** Mass picketing shall be defined as picketing which obstructs the ingress and egress of employees, customers and suppliers to the necessary areas of Eastern's operations.

couraging customers from patronizing Eastern's flights, and discouraging other Eastern employees from reporting for work.

44. On March 13, over 100 IAM strikers broke from a picket line at the Shuttle Terminal and attempted to enter the facility, which is private property.[5] They banged on the terminal windows and doors, yelled and blew whistles. (April 4 Tr. 78–81.) The following Saturday, several hundred IAM members and their supporters held a rally in the metered passenger parking lot opposite the Shuttle Terminal. Following the rally, they charged the terminal facility and congregated on the adjoining sidewalk blocking access from the parking lot to the Shuttle and shouting slogans. This demonstration effectively shut down Eastern's operations at the Shuttle Terminal. (March 22 Tr. 16–18, 22; March 29 Tr. 93–94, 96, 109, 126, 291; April 4 Tr. 42–46, 126–129.)

45. Because of the threatening nature of these uncontrolled demonstrations, it was necessary for Eastern to secure all the doors to the Shuttle building. (March 22 Tr. 18, 22–24, 26–27; March 29 Tr. 291–292; April 4 Tr. 42, 69–70.) Before the building was secured, however, the strikers stuffed rolls of toilet paper down the toilets at the Shuttle Terminal, causing the bathrooms to flood. (March 29 Tr. 16–17, 27; April 4 Tr. 45, 127.)

46. Port Authority rules have prohibited demonstrations in the Central Terminal and the adjacent roadway that impede traffic flow and upset operations at the airport. (August 2 Tr. 1405–1408.) Despite these rules, in early July the strikers were impeding access to and from the Eastern terminal, interfering with passengers as they attempted to enter and leave the Central Terminal. (July 17 Tr. 17, 19; August 30 Tr. 2987.) Defendant IAM General Chairman Washington admitted that the picketers have interfered with the skycaps' ability to serve Eastern passengers. (August 15 Tr. 2044–2048, 2056–2061.)

47. In addition, every day, every three hours, vans have come from the IAM union hall to change shifts of picketers in front of the Eastern terminal, and remain there sometimes fifteen minutes or longer blocking traffic, in direct violation of Port Authority rules. (August 1 Tr. 1286, 1338; PX 13B; August 3 Tr. 1464; August 15 Tr. 2049–2050; IAM CC.)

48. On Friday, July 14, several hundred IAM, ALPA and TWU strikers and supporters marched and congregated in the roadway, obstructing all direct automobile access to Eastern in the Central Terminal. Defendant Washington admitted that this demonstration was conducted without authorization from the Port Authority. (August 15 Tr. 2072.) The demonstrators congregated in front of the Eastern baggage-claim area, preventing Eastern passengers from exiting and obtaining taxi and car-service transportation. They also congregated in the front of Eastern's passenger drop-off area, pushing the barricades out to the curb and rendering the terminal inaccessible to Eastern customers and skycaps wheeling luggage. (July 17 Tr. 26–29, 33–34, 39–40; August 1 Tr. 1287, 1321–1322, 1324–1328, 1334–1338; PX 1; PX 13C; PX 14B; PX 15A; PX 15C; PX 15D; PX 16A—PX 16D; PX 17D.) The demonstration forced Eastern customers to use circuitous and dangerous routes to obtain access to the Eastern terminal; one man had to push his baby in its stroller into the roadway and through the demonstrators to reach the terminal. (July 17 Tr. 26–27, 38–39, 58–59, 66; PX 1.) The demonstrators also engaged in yelling, chanting, clapping, whistle-blowing, screaming, and other noise-making that made normal conversation impossible. (July 17 Tr. 26–28, 34, 40, 43–44; PX 1.) The same day, 200 to 300 strikers, including striking pilots, started screaming at an Eastern manager and hurling objects when they recognized the car he was driving. (July 25 Tr. 364–366, 372–373.)

49. At LaGuardia, the picketers have continued to pitch the barricades into the street and block access to the check-in area and terminal, making it extremely difficult

---

**5.** The Shuttle Terminal has since been sold.

for the Eastern skycaps to assist passengers. (September 15 Tr. 3077, 3079; October 3 Tr. 3347–3350, 3361, 3366–3367.) The picketers have blocked both the entrances to the terminal and the baggage chute, making it virtually impossible for passengers to enter and for skycaps to load passengers' baggage. (September 15 Tr. 3078–3079.) While the picketers have a long area behind the barricades, they have been congregating near the doors at the extreme end of the barricades, in order to confront the most passengers and working employees. (September 29 Tr. 3159; October 3 Tr. 3348–3349.) They have made excessive noise—both yelling and using tambourines, knives, spoons (for beating on the barricades), and whistles—which severely hampers the skycaps' ability to find out a passenger's destination. (September 15 Tr. 3080, 3101; October 3 Tr. 3351; PX 52D.) They have thrown oil and picket signs with handwritten derogatory comments down the baggage chute, causing safety problems and harassing Eastern's employees. (September 15 Tr. 3078–3079, 3097–3098; September 29 Tr. 3177–3178; PX 52E; IAM CC.) Early in the strike, the picketers cut a baggage conveyor belt at the Central Terminal. (March 22 Tr. 44.) They also have sabotaged these belts with "crazy glue." (IAM CC.)

50. The number of daily flights at LaGuardia has increased from 12 in August to 30 in October, with over 40 flights anticipated by December, 1989. This number exceeds the 36 departures prior to the strike. This has resulted in the number of skycaps needed on the curb at LaGuardia to be increased from 5 per shift in August to 9 per shift in October. Because Eastern does not have a sufficient number of ticketing positions inside the terminal, it is essential that the skycaps be able to check passengers' bags at the curb so that passengers can go directly to the departure gates. (October 3 Tr. 3344–3346, 3350.) The current placement of the picketers reduces Eastern's curb space to 32 feet. Since each skycap's cart is over 5 feet long and 2 feet wide, there is insufficient area for the skycaps to handle the 3,800 passengers per day. (September 15 Tr. 3077–3079, 3082–3083; October 3 Tr. 3349–3350; PX 18.) Movement of the picketers 40 feet to the east of their current location would permit them to have equal or greater visibility to departing passengers while enabling Eastern to use its curb for passenger check-in. (October 3 Tr. 3349, 3352–3353, 3361; PX 18; PX 22C.)

### Interfering With And Harassing Customers

51. On March 19, a car driven by someone dropping off a passenger at the Shuttle was struck by an IAM picketer with an "On Strike" sign. A paper bag with 8 nails sticking out of it was placed directly under the front right tire. (March 29 Tr. 64–69.)

52. On July 12, at the curb of the Eastern Terminal, 5 to 10 picketers surrounded a customer's car, put their hands on the hood, and screamed "Scab" and "Cheapskate" while clanging the metal barricades. Two passengers refused to leave the car while the picketers were there. (July 24 Tr. 147–150.) During the week of July 17, striking pilots blocked customers who were attempting to exit their vehicles at the terminal. (July 25 Tr. 326–327, 345, 352.)

53. Picketers and strikers have poked and pushed customers. (July 24 Tr. 164–165; July 25 Tr. 562, 592–593.) They have also disrupted the activities of ticket agents attempting to serve customers. Because picketers have continually screamed epithets at customers and employees at the top of their lungs, the ticket agents have been unable to hear the customers and to concentrate on meeting customer needs. Strikers have thrown objects at ticket agents while customers were present. In late July, an egg and a stink bomb were thrown in the area of Eastern's ticket counter, where customers purchase tickets. The egg narrowly missed a ticket agent and the stink bomb made a pregnant ticket agent ill from the fumes. (July 25 Tr. 554, 557–562; August 1 Tr. 1284–1285, 1291–1292; September 29 Tr. 3190–3194.)

54. Picketers have verbally abused passengers calling them "scab," "cheap ass," "sluts" and "whore" (September 15 Tr. 3094–3095, 3102; October 3 Tr. 3353–3354;

PX 52C); telling them that their flights have been cancelled, to have a "shit flight" and that they are "going to be killed." (September 15 Tr. 3098, 3102; PX 52F; PX 52G.) Striking pilots have been abusive to Eastern passengers, telling those who disagree with them to go back where they came from. (August 1 Tr. 1303–1304.) Picketers have tried to intimidate and coerce potential and actual customers by accosting customers and shouting deliberately provocative, harassing and coercive remarks like "All be killed" [6] [remark by pilot]; "Make sure your children wear life vests, the plane will go in the water"; "[W]hy does a rich man with a chauffeur want to fly an airline that is going to crash" [remark by pilot]; "Don't fly with your kids, put your mother-in-law on the plane with you"; "Lady, your eyeballs are going to fall out and your skin is going to peel back"; "The airline is not safe, [passengers] will not feel a thing coming down at 800 miles an hour"; "[I] will sleep very well when your plane goes down ... and your body is sprawled all over the ocean in bits and pieces ... [and y]our skin ... and [y]our flesh is torn in a million pieces ... and splattered all over" [remark made on July 14 to a woman and her 76–year old mother]; "you're going to die" [remark made by striking ramp serviceman to passengers with small children] (July 17 Tr. 13, 15, 43, 61; July 24 Tr. 110; July 25 Tr. 307, 323–324, 341–343, 510–511, 529, 551–552, 555; August 1 Tr. 1282–1283, 1323, 1344–1345; August 3 Tr. 1416–1417; PX 13A; PX 13D; PX 14A; PX 20; PX 22D; IAM CC.)

55. Children who have been harassed by strikers have been reduced to tears. One thirteen-year-old girl was made so distraught by a striking pilot's comments that it was not safe to fly, she would not board the flight on which she had a reserved seat. (July 17 Tr. 15–16.) In another instance, a young woman who heard such remarks obtained a refund of her Eastern ticket and paid twice as much to fly Delta. (July 24 Tr. 158; July 25 Tr. 585–586; August 1 Tr. 1340; August 3 Tr. 1417.) Picketers

screamed in the face of a baby and a striking pilot said to the mother, "cute baby, I hope he survives this flight." (PX 19.) On August 30, 1989, another picketer told a mother traveling with her baby that she should "have a body bag for the baby." (PX 52M.)

56. Adult passengers also have been intimidated or frightened. In June, 7 or 8 picketers intimidated and frightened a young woman and an older man who were trying to check her bags with an Eastern skycap. The picketers surrounded them, yelling "These planes will not fly, it is going to fall, going to crash, your daughter is going to ... die," and calling the man a "fucking stupid ass," prompting the young woman to ask, "Are they going to hurt us, do anything?" (July 24 Tr. 158–160.)

57. The picketers have deliberately and repeatedly misled customers to prevent them from using Eastern by claiming, for example, that "Eastern Airlines is closed. Eastern Airlines is shut down." They also have falsely stated to prospective customers that no parking was permitted in an area directly in front of the Eastern terminal used for dropping off departing passengers. (July 17 Tr. 32, 43–44; July 25 Tr. 518, 555; August 1 Tr. 1282–1283; IAM CC.) One customer was told that her "flight was cancelled and she had to go to Pan Am.: As a result, she missed her Eastern flight and had to book another. (July 25 Tr. 562–563.)

58. On several occasions the picketers have made derogatory remarks about passengers' race or ethnic backgrounds. (IAM CC.) On one occasion the picketers confronted four Eastern passengers of Hispanic descent, including two elderly passengers, one of whom was in a wheelchair, and verbally abused them in both Spanish and English. (September 15 Tr. 3099; October 3 Tr. 3280–3283, 3292.) The remarks were so outrageous and alarming, including predictions of the passengers' death if they flew Eastern (October 3 Tr. 3282, 3285), that the passengers did not want to fly

---

**6.** As hereafter discussed, Eastern agreed to defer its request for injunctive relief barring defen-

dants' continued dissemination of false information.

Eastern, but did so only after talking with Eastern's security personnel. (PX 52H; September 15 Tr. 3099.) At least one picketer also shook his fist in a threatening manner at the passengers, making the individual who was dropping them off afraid that a fight might ensue. (October 3 Tr. 3283.)

59. IAM strikers have intentionally dropped wet paper and ice on the curb, causing customers entering the Eastern Terminal to slip. Picketers regularly have placed trash and garbage in the front of the terminal. Defendant Washington conceded that the picketers have violated the no-littering provision of the Port Authority's rules regulating picketing at LaGuardia. (July 25 Tr. 530, 538–540, 561; August 1 Tr. 1349–1350; August 3 Tr. 1419; PX 22A; August 15 Tr. 2052, 2068.)

60. The picketers have continued to deface Eastern property with anti-Lorenzo stickers and anti-Lorenzo graffiti such as "Eastern stinks" and "Lorenzo sucks." (October 3 Tr. 3362–3366, 3371; PX 42; PX 62A–PX 62D.) The picketers also repeatedly leave excessive litter in the picket area, causing Eastern to have to clean up after them. (October 3 Tr. 3351; PX 17A.)

61. Strikers have harassed and intimidated Eastern customers and employees who have testified at the hearing before this Court on behalf of Eastern. On or around July 25, a telephone message was left for an Eastern customer who testified the previous day, saying that "... Eastern Air Lines has paid ... [him] and now ... [he] has to pay us." (July 28 Tr. 1040.) An Eastern employee received harassing phone calls at the Marriott Hotel later on the day he testified. (August 1 Tr. 1292–1293.)

62. On July 25 at the Marriott Hotel near LaGuardia, 10 or 12 picketers intimidated witnesses for Eastern scheduled to testify at this hearing by using obscene language and gestures, causing one female witness to cry. (July 25 Tr. 686–687, 696.)

### Interfering With And Harassing Employees

63. In March, IAM strikers verbally threatened working Eastern employees, spat on them, stomped and banged on the workers' vehicles and threw hot coffee at working Eastern employees entering the employee parking lot. Several ticket agents were almost run off the road while operating their personal vehicles. Strikers threatened the drivers and hit the vans used to transport working Eastern pilots and flight attendants back and forth to the Marriott Hotel, where they were being lodged by Eastern. (March 22 Tr. 37–38; April 4 Tr. 46–50, 70.) In March, strikers repeatedly threw nails on the access road to the Eastern employee parking lot in an effort to disable working employees' vehicles. (March 22 Tr. 33; April 4 Tr. 47, 84, 153.) Strikers also threw rocks at the windshields of employees' vehicles and Eastern's security van, causing property damage. (March 29 Tr. 145, 262–264–266; April 4 Tr. 24–26, 34–35.) At 11:00 p.m. on March 15, five picketers approached Eastern's Shuttle shift manager as he was leaving the employee parking lot. They began kicking and punching his car, and one of the picketers smashed the car window. (March 29 Tr. 274–278.) Another Eastern employee was the subject of an attempt to force her car off the road. (March 29 Tr. 165–166.)

64. In March, IAM strikers made harassing telephone calls in which they made veiled threats to the safety of working Eastern employees, their families and property. Strikers persistently took photographs of Eastern employees who were reporting to work. (March 29 Tr. 207, 228, 242, 258; April 4 Tr. 47, 158.) The IAM strikers also recorded, or threatened to record, working employees' license plate numbers. (March 29 Tr. 20, 27.) Also, in March, strikers threatened a working employee, saying they would put a bullet in his head, kill his mother, and make an example of him. (March 29 Tr. 205.)

65. On March 6, John DePaolo, strike captain and the IAM representative responsible for negotiating the number of picketers allowed at the LaGuardia Airport picket sites with the Port Authority, told Eastern employees, "You deserve all the trouble

you are getting, we are going to burn you down." (March 22 Tr. 29–30; March 29 Tr. 79–80, 293–294.)

66. Also in March, IAM strikers and supporters were involved in intimidation, threats of violence, breach of the peace and disorderly conduct at the Marriott Hotel near LaGuardia Airport, where Eastern's employees are housed during lay-overs. IAM strikers used bullhorns and screamed obscenities and threats of bodily harm at the crews. (March 29 Tr. 171–75, 177–178, 181, 193–196, 199–200, 244–246; April 4 Tr. 52–54, 57, 83.)

67. The picketers have continually yelled at Eastern employees using language intended to provoke a violent response: e.g., "scum bag"; "douche bag"; "cocksucker"; "motherfucker"; "nigger"; "Uncle Tom"; telling a black employee to "shine [Lorenzo's] shoes"; and commenting about how one's wife "smells." (July 17 Tr. 21; July 24 Tr. 109–110, 112; July 25 Tr. 528–529, 556.)

68. The picketers have been violent and abusive, throwing ice cubes at Eastern's Security Coordinator (August 1 Tr. 1288), and threatening working employees and passengers. For example, in September four strikers in a car pulled up in front of a uniformed flight attendant who was waiting at a bus stop. One striker, wearing an anti-Lorenzo badge, got out of the car and threatened the flight attendant by saying that the "next time he sees . . . [the flight attendant] wearing that uniform he will rip it off and kick . . . [the flight attendant] in the butt." The strikers also used profanity in a threatening and intimidating manner. (September 15 Tr. 3069, 3076.) The employee, clearly frightened by the incident, no longer wears his uniform to and from work. (September 15 Tr. 3070.) Also in September a female attendant, in civilian clothes, was approached from behind at the doorway of her residence by a man who stated "Don't you know we are on strike: We know where you live." (September 15 Tr. 3089; PX 52(O).) The woman, too terrified to turn around and look at the individual, ran into her home. (September 15 Tr. 3089–3090; PX 52(O).) While at LaGuardia

in late August, two female flight attendants were verbally abused, called "Lorenzo's whore," "bitch," "scab," "dike" and "dog." Barking noises were also made by the picketers, who made these comments as they surrounded the women who were standing between the Eastern and Continental terminals. (September 15 Tr. 3090; September 29 Tr. 3124–3127, 3133; PX 52A.) In July, picketers sent letters to neighbors of a working pilot stating "A scab lives next to you, see what you can do about ridding your neighborhood of scabs." (PX 11; PX 12.)

69. On September 12, for example, a flight attendant was physically assaulted and verbally abused by the picketers at the Eastern departure level. (September 29 Tr. 3147–3150.) The flight attendant, who was in civilian clothes but was carrying her Eastern employee luggage, was shoved twice by a striking uniformed pilot who was behind the picketing barrier she was leaning on. (September 29 Tr. 3147–3151.) The striking pilot then kicked the flight attendant in the shins with the heel of his shoe. (September 29 Tr. 3149–3150, 3158.) During this incident the striking pilot used vulgar, insulting language in an attempt to intimidate the attendant, who was "scared to death." (September 29 Tr. 3148–3150.) This same flight attendant was subject to extreme verbal abuse by the picketers as recently as September 23, when she was entering the terminal to check in for her assignment. (September 29 Tr. 3152.) The screaming of epithets was within earshot of numerous passengers who were "shocked" at the behavior of the picketers. (September 29 Tr. 3153.)

### The Authorities Have Not Controlled The Strikers

70. The Port Authority police at LaGuardia Airport have been unable or unwilling to control the illegal conduct of the strikers.

71. On numerous occasions in March, Eastern employees were verbally threatened and spat on and their vehicles were stopped and banged on by individuals wearing IAM signs. The Port Authority police

who were present did nothing. (March 20 Tr. 5–7, 231–233; 275–276; April 4 Tr. 47–48, 51, 150–151.)

72. On March 15, an Eastern employee had his front windshield shattered by a striker wearing an IAM sign as he was leaving the employee parking lot. The employee approached a Port Authority police officer, advised him of the incident and pointed out the striker. The officer did nothing. (March 20 Tr. 274–278.)

73. One working flight attendant who had covered her license plate number in order to conceal her identity from the strikers had her car pulled over by the Port Authority police before entering the Eastern employees' gate and was forced to wait, in full view of picketers yelling threats and obscenities, for twenty-twenty-five minutes while the officer wrote out a summons because she had covered her license plate. The officer refused her numerous requests to move twenty-five feet to the security gate and forced her, in full view of the picketers, to remove the tape which was obstructing the license plate. (March 29 Tr. 16–24.)

74. One Port Authority sergeant, upon discovering that Texas Air Chairman Frank Lorenzo would be walking out the front of the Shuttle Terminal on March 23, confronted Eastern's Director of Airport Services, demanding to know why the police had not been informed of Mr. Lorenzo's presence and expressing concern for the safety of his *police officers*, who would be outnumbered if the picket line became disorderly. At the time, the number of picketers already present at the site far exceeded the allowable number of picketers agreed upon by the IAM and the Port Authority. (March 29 Tr. 37–38, 40–42, 46–49; April 4 Tr. 169–170.)

75. Despite numerous requests by Eastern in March for increased police protection, the Port Authority failed to provide adequate protection to Eastern's employees and property. (March 29 Tr. 129; April 4 Tr. 40, 49, 52, 62.) For example, at the rally held on March 18th at the Shuttle Terminal, at which approximately 1,200 people were present (March 29 Tr. 90, 106), the Port Authority employed only 50 officers dressed in normal attire. (March 20 Tr. 40, 44, 91.) By contrast, at a demonstration held by Reverend Al Sharpton less than six months earlier, at which no more than sixty demonstrators were present, the Port Authority had approximately 125 officers in helmets carrying oversized nightsticks. (March 29 Tr. 136.)

76. On March 23, approximately 60 to 70 picketers congregated in front of the Shuttle. Eastern informed the Port Authority police that this number far exceeded the number agreed to by the Port Authority and the IAM. The Port Authority's strike commander responded that there was nothing she could do to reduce the number and advised him that because the TRO then in effect was a civil matter, Eastern would have to go to court to enforce it. This officer testified that even if 1,000 picketers were present, it was still a civil matter, and as long as no laws were broken, there was nothing the police would do about it. (March 29 Tr. 51–54.) As recently as September 27, 1989, that continued to be the Port Authority's position when Eastern advised the Port Authority that the number of picketers was in excess of the permissible number. The Port Authority police again responded that they would not limit the number of picketers. The responding officer stated that "this is America and they can have as many people as they want out there." (September 20 Tr. 3180–3182; PX 53; IAM CC.)

77. In March, the Port Authority police repeatedly did nothing in response to appeals to act or in the face of unlawful acts. (March 29 Tr. 207, 220, 267, 284–285; April 4 Tr. 48–49, 52, 86–87, 100–101, 111, 119.)

78. In early June, the chief ticket agent reported that picketers, and in particular one IAM striker, were consistently screaming so loudly the ticket agents could not hear the customers. The police responded that "there is nothing … [they can] do …" (July 25 Tr. 558–559, 583–585.)

79. Also in June, an Eastern employee, who was subjected to verbal intimidation and harassment by striking pilots and persons carrying IAM signs, among others,

complained to a police sergeant at LaGuardia. He was told that "there is nothing we can do about it, all we are supposed to do is make sure there is no bodily injury." (July 25 Tr. 344.) While strikers accosted and intimidated Eastern customers at LaGuardia in June and July, one frequent Eastern traveler observed that the Port Authority police were busy making notebook entries and smoking cigarettes, and wrote a complaining letter to the Director of the Port Authority. (July 25 Tr. 323–325.) The police have done nothing to stop other instances of harassment. (July 25 Tr. 524–525, 533.)

80. In late July, egg-throwing by strikers at Eastern's ticket agents was reported to the Port Authority police. The police took a report but said, once again, "there is nothing we can do." (July 25 Tr. 560–561.)

81. The Port Authority police made no arrests at the July 14 demonstration even though it was unauthorized and prevented all vehicular traffic from reaching the Central Terminal at 5:30 p.m. on a Friday evening. The Port Authority police refused to stop the demonstration and escorted the demonstrators throughout the entire demonstration, even when they prevented passengers from entering and exiting the Central Terminal at Eastern's departure and arrival levels. (July 17 Tr. 51–52.)

82. The Port Authority police also have turned a deaf ear and a blind eye on pleas from Eastern employees being assaulted and verbally harassed by the picketers. On one occasion in September, a Port Authority police officer ignored a plea for help from an Eastern flight attendant who was assaulted and verbally abused by a striking pilot. (September 29 Tr. 3144, 3150.) Another Port Authority police officer walking in the vicinity of the picketers turned a deaf ear on the taunting, profane screams of the strikers who had essentially surrounded two flight attendants waiting for a cab. (September 29 Tr. 3127, 3130.)

83. The police have refused, or have been unable, to enforce their own picketing rules, including the following rules: requiring that the picket area be kept clean ("Area" Rule 2, PX 21; July 17 Tr. 16, 24;

October 3 Tr. 3351); prohibiting private vehicles belonging to picketers from parking in the vicinity of the picket line ("Area" Rule 3, PX 21; July 17 Tr. 24); prohibiting mounted signs and signs fastened to buildings, fences or to the ground or structure ("Signs" Rules 1 and 2, PX 21; July 17 Tr. 24); prohibiting the picket line from interfering with free movement of pedestrians or vehicular traffic, blocking any roadway, gates or entrance and requiring the picket line to keep moving ("Pickets [General Conduct]" Rule 2, PX 21; July 17 Tr. 13, 17); prohibiting picketers from engaging in catcalling at persons crossing the picket line ("Pickets [General Conduct]" Rule 3, PX 21; July 17 Tr. 13–16); prohibiting those picketers not on an active picket line from congregating in the vicinity of the line ("Pickets [General Conduct]" Rule 4, PX 21; July 17 Tr. 19–20); prohibiting amplification devices without special permission and instruction of the Port Authority police ("Pickets [General Conduct]" Rule 8, PX 21; July 17 Tr. 21). (See also March 22 Tr. 48–50; March 29 Tr. 285–288.)

84. On more than one occasion, and as recently as August, Eastern has advised the authorities that the picketers were screaming into the Eastern terminal, harassing both passengers and working employees. The Port Authority police would not take any action. (September 15 Tr. 3095–3097; PX 52D; PX 521.)

85. As a result of the inability or refusal of Port Authority police to act, Eastern has had to employ added security at LaGuardia. Consequently, Eastern's post-petition security cost is over $250,000 per week. (April 4 Tr. 159–160; July 17 Tr. 31.)

*The Strikers' Unlawful Activities Have Been Authorized Or Ratified By The Unions*

86. During the strike, the IAM, ALPA and TWU Defendants have engaged in, authorized, or ratified a pattern of illegal conduct designed to shut down Eastern's operations at LaGuardia.

87. The IAM, TWU and ALPA have coordinated numerous strike-related activi-

ties and functions. All three Unions have an integrated picket line at LaGuardia and share picket responsibilities. (August 30 Tr. 2984, 3024–3027.) The IAM provides ALPA strikers with parking and transportation to the airport for picket duty. (August 24 Tr. 2738; August 30 Tr. 2983.) The IAM vans offer free beverages and sandwiches to all picketers (August 24 Tr. 2757, 2841–2842), despite the fact that there is a cafeteria fifty yards away from the picketing location. (August 24 Tr. 2757.) The IAM also provides ALPA with anti-Lorenzo stickers. (August 24 Tr. 2796–2797.)

88. As previously noted, on July 14, several hundred IAM, ALPA and TWU strikers and supporters marched and congregated in the roadway, obstructing all direct automobile and pedestrian access to Eastern in the Central Terminal. As stated previously, Defendant Washington admitted that this demonstration was conducted without obtaining authorization from the Port Authority. (July 17 Tr. 25–29, 39–40; August 1 Tr. 1321–1322, 1324–1328, 1334–1338; August 15 Tr. 2072; PX 1; PX 13C; PX 14B; PX 15A; PX 15C–PX 15D; PX 16A–PX 16D.) ALPA encouraged its members to participate in this IAM-sponsored rally (August 24 Tr. 2751, 2771), by putting messages on its phone tree and code-a-phone[7]. (August 24 Tr. 2771; August 30 Tr. 2985; ALPA Z.) At least one ALPA official at the front of that unauthorized demonstration walked next to a banner stating "TWU/IAM/ALPA Solidarity Forever." (August 24 Tr. 2770, 2793–2794.)

89. Also on July 14, 1989, defendant Washington was present during a 15–minute period while the picketers beat on the barricades; at no time did Washington take any steps to quell this improper conduct. (August 15 Tr. 2040, 2069–2070.)

90. On at least one occasion, defendant Washington observed strikers putting anti-Lorenzo stickers on the walls of Eastern's property at LaGuardia. While he told the strikers not to do that, he did not remove the stickers. (August 15 Tr. 2063–2065, 2068.) At least one ALPA member also has been observed defacing Eastern's property with anti-Lorenzo stickers. (September 29 Tr. 3176, 3187.)

91. Defendant Washington, the number one IAM official at LaGuardia, has taken the insupportable position that the permit allowing 12 picketers at each level of the Central Terminal does not even restrict the number of ALPA and TWU picketers. (August 15 Tr. 2092–2093.) He also has testified that he does not know if the Port Authority rules require the picketers to keep their area clean (August 15 Tr. 2066), and admitted that he has not reviewed the rules since before the strike began. (August 15 Tr. 2066–2067.) Rule No. 2 of the Authority rules prohibits littering. (PX 21.)

92. This Court finds that the testimony by Union officials that they are unaware of the picketers' illegal conduct is not credible. Even if that testimony were accepted at face value, it evidences a studied effort by the officials to remain ignorant of these events and, under the circumstances, they must be charged with constructive knowledge of these matters. As of mid August, only one member of all three Unions has been subjected to Union disciplinary proceedings as a result of improper strike activity. (August 15 Tr. 2098–2099, 2186.) The testimony demonstrates that the Unions have instigated and encouraged the unlawful strike activities. At a minimum, the Unions clearly have abandoned their duty to supervise their members' conduct and to ensure that the strike is conducted in a peaceful and lawful manner. In so abandoning this duty, the Unions have effectively authorized and ratified the violence and unlawful activities.

93. For example, the LaGuardia Strike Chairman for ALPA, the number one ALPA official at LaGuardia, Captain Welch, has stated that he has not seen a copy of the Port Authority's picketing rules nor has he ever requested a copy of them.

---

7. For example, the ALPA Code–A–Phone is a communications service that ALPA provides to its members in order to keep them updated regarding strike matters. Members access the messages, which change daily, by dialing a toll-free "800" telephone number.

(August 24 Tr. 2733, 2801–2802.) Additionally, at least one block leader, who had picketed with his block on at least ten occasions and who is responsible for answering any questions about the strike while his group is picketing (August 30 Tr. 2969, 3003), has testified that he has neither seen nor asked for these rules. (August 30 Tr. 3015–3016.)

94. While ALPA officials, including Strike Chairman Welch, repeatedly claimed to be unaware of any complaints about ALPA strikers' behavior (August 24 Tr. 2742, 2746, 2748–2749, 2754; August 30 Tr. 3018–3020), this Court finds that these claims are not credible and that the asserted lack of knowledge is either false or represents a "head-in-the-sand" attitude by ALPA officials to ignore that which is going on around them.

95. The above finding is also supported by the fact that ALPA has failed to have a single individual responsible for picketing activity at LaGuardia (August 24 Tr. 2734–2735) and that ALPA's LaGuardia Comcenter, the heart of its strike effort, is located in Danbury, Connecticut, at least one hour and fifteen minutes away from the airport. (August 24 Tr. 2763.) Additionally, the Strike Chairman has admitted that he has not been to the picket line at LaGuardia since before the TRO was issued. (August 24 Tr. 2762, 2781.) Therefore, even though ALPA officials have repeatedly been made aware of picketing violations throughout this extended hearing, they have taken no steps to eliminate them. Finally, a block leader who testified that he was present at the picket line at LaGuardia on August 29 and saw no prohibited behavior (August 30 Tr. 2990–2991, 3018–3020) was clearly discredited by the laundry list of incidents involving at least four pilots. (October 3 Tr. 3355–3359; PX 60; PX 61.)

96. Captain Welch's own testimony indicates that he actually is aware of complaints about ALPA strikers or chooses to remain ignorant of these incidents. In fact, one of his own picketing supervisors complained to him about the noise that was being made by the picketers, including striking pilots, by banging on the metal barricades to produce a deafening, intimi-dating noise. (August 24 Tr. 2743, 2745, 2778–2779, 2781.) Additionally, while he claims to never have received any complaints with regard to striking pilots making obscene gestures (August 24 Tr. 2746–2747), one of ALPA's own picketing supervisors was photographed making such a gesture. (PX 13A; August 24 Tr. 2791.) Further, while ALPA's stated policy is to use printed picket signs from its Herndon strike headquarters (August 24 Tr. 2748–2749), and Captain Welch claimed not to have received any reports on strikers using unauthorized signs (August 24 Tr. 2788), ALPA's own picketing supervisors and members have been displaying handwritten signs stating, among other things "Eastern the world's most dangerous airline. Keep away." (August 24 Tr. 2788–2789; August 30 Tr. 3008; PX 13A.)

97. Despite the integrated nature of the picket line (August 30 Tr. 2984, 3024–3027), picketers, particularly ALPA members, who have been described as "more mature" by one of their block leaders (August 30 Tr. 3026), have taken an "its-not-my-job" attitude toward supervising other members of the picket line who might be engaging in violations of the Port Authority rules (August 30 Tr. 3024.) One block leader has stated that while he is responsible for his block members when they picket, he did not consider himself responsible for policing the conduct of those IAM and TWU members on the picket line with him, even if he observed violations of the rules, including the placement of a banner with a skull and crossbones. (August 30 Tr. 3005–3007, 3024–3029; PX 22D.) Nor are ALPA members supervising their own members' conduct as is clearly evident from the fact that a striking pilot, on picket duty behind the barriers at LaGuardia, physically assaulted and verbally harassed a working flight attendant who was waiting at the departure level, all while another striking pilot was picketing at the same location and did nothing. (September 29 Tr. 3148–3150, 3160.)

## E. ILLEGAL ACTIVITIES AT AND NEAR HARTSFIELD AIRPORT

98. Hartsfield International Airport in Atlanta, Georgia is the principal hub of the

new Eastern system. During July, Eastern operated 82 flights a day out of Atlanta; that number increased to 270 as of October 1, 1989 and is expected to exceed 300 before the end of the year. (July 17 Tr. 72; October 3 Tr. 3334.)

99. The Eastern terminal at Hartsfield is comprised of two concourses leading to boarding gates and the landside terminal, where ticketing and baggage claims activities are carried out. Transit between the two concourses is accomplished by traveling through the landside terminal; this is also necessary for connection with other airlines. (July 17 Tr. 72–73.)

100. Since the Eastern strike began, IAM, ALPA and TWU members and supporters have been engaged in picketing and other activities at the passenger pick-up and drop-off areas, ticketing lines, concourses, departure gates, employee cafeteria and parking areas, and the entrance to Eastern's maintenance base. (July 17 Tr. 77, 80–82, 85–87, 90; July 24 Tr. 241–242; July 25 Tr. 289–290, 299; July 27 Tr. 942–943; July 28 Tr. 981–982, 987, 1002; August 17 Tr. 2385, 2444–2447.)

101. The IAM, ALPA and TWU have coordinated numerous strike related activities and functions. The IAM local president and ALPA's Atlanta strike chairman have coordinated the Unions' "presence" at the terminal. (August 16 Tr. 2223.) ALPA members have utilized the IAM's Tent City, the IAM's strike headquarters at the airport, and ALPA has had rallies there. (August 16 Tr. 2255, 2300; August 17 Tr. 2359–2360.) The IAM and ALPA have coordinated the numbers of observers equipped with video cameras in the terminal and, at times, have shared equipment. (August 16 Tr. 2280; August 21 Tr. 2545.) The IAM members also help ALPA count passengers. (August 21 Tr. 2532, 2542.) ALPA and TWU work closely as well. ALPA allows the TWU to use its picketing office, signs and telephones. ALPA transports TWU picketers in its vans, coordinates the number of picketers, and has encouraged TWU members to participate in its demonstrations. (August 16 Tr. 2319; August 17 Tr. 2375, 2439.) Additionally,

the ALPA picketing supervisor has stated that "[t]he TWU is basically part of our operation ... we brief them, we transport them, we do everything." (August 17 Tr. 2439.) He further stated that, for practical purposes, he is the picketing supervisor for TWU strikers as well (August 17 Tr. 2441), and that he had assisted the TWU in drafting a letter to the Commissioner's office in order to obtain a picketing permit (August 17 Tr. 2350–2351). The TWU members also assist ALPA in counting passengers and other observation tasks. (August 21 Tr. 1542, 2593.)

102. In the course of lawful activities, however, the IAM, ALPA and TWU Defendants have encouraged, authorized or ratified a variety of illegal tactics at Hartsfield directed at Eastern's employees, customers, and others, and designed to disrupt Eastern's flight operations and its business. Examples of unlawful tactics at Hartsfield Airport are described in the paragraphs that follow.

### Harassment and Interference at the Terminal and Concourse

103. Since the beginning of the strike, the Defendants have violated the Hartsfield Airport rules and regulations governing picketing by allowing excessive numbers of picketers; failing to require picketers and strikers to keep moving; allowing them to stand in groups and block entries to the terminal; permitting them to stand at departure gates to block access to and from airplanes; allowing picketing outside permitted areas; allowing strikers to enter ticket lines to confront passengers and to block passengers from the ticket lines; allowing ALPA and IAM strikers to distribute to, and place anti-Lorenzo stickers on, passengers without first obtaining their consent; and allowing picketers and strikers to obstruct passengers and employees within the terminal. They also have allowed strikers all over the concourse and on Eastern's property. Many of these violations have continued to occur despite the issuance of a TRO by this Court on July 17 and in violation of the Unions' own rules. (July 17 Tr. 77, 81–83, 85–87, 95, 98–110; July 24 Tr. 27–29, 51–53, 56, 83–84, 100,

125, 238–241, 252; July 25 Tr. 621, 698–699; July 27 Tr. 886, 925, 930–932; 942–945; July 28 Tr. 981–982, 987, 995–996; August 1 Tr. 1140–1141; August 17 Tr. 2372–2374, 2377–2378, 2380, 2399, 2431, 2465, 2467–2468; ALPA A; ALPA U; PX 2; PX 10; PX 43.) That these violations have occurred was acknowledged in Court by Michael Flynn, President of IAM Local 1690, and by ALPA's Atlanta picketing supervisor, who acknowledged that he *himself* had violated a picketing rule and that he had called certain acts, such as confronting the crews at the gates, "fun" in communications with the picketers. (August 14 Tr. 1948, 1955, 1968, 1975–1976, 1978–1981; August 17 Tr. 2432, 2465, 2467–2468.)

104. Demonstrators have intentionally sought to provoke, intimidate, and frighten Eastern passengers by yelling at them, and making threats about safety, in many instances in the presence of children. (July 24 Tr. 223–224; July 27 Tr. 882–883.) For example, "We [demonstrators] are going to be out here until one goes down"; "arms and legs [will be] dangling outside of planes"; "[you] better take a parachute"; "[B]e sure you have your dental records"; "you're going to bet your life on this flight." (July 17 Tr. 75, 84–85, 110; July 24 Tr. 24, 26; July 25 Tr. 294, 302, 323–324, 420, 496, 605–606, 688–689, 692; July 27 Tr. 883–884, 929; July 28 Tr. 986, 1031.) Although an ALPA observer supervisor has stated that it would be inappropriate to say "you're going to die" to passengers (August 21 Tr. 2585), ALPA has no program for disciplining its members who engage in this kind of behavior. (August 17 Tr. 2451.)

105. Passengers subjected to these remarks have been intimidated, frightened or made visibly upset by them; some have refused to fly on Eastern. (July 24 Tr. 26, 52–53, 208–209, 224; July 27 Tr. 930; PX 59.) One passenger, walking with his children through the terminal, was yelled at by an angry picketer not to fly Eastern because it was unsafe. This made the passenger feel "a little overwhelmed at first, a little threatened ... then later ... kind of angry and ... a little insulted and humiliated. This passenger called the Commis-

sioner of Aviation's office to complain and, in return, received a long letter listing the locations where people can picket. This letter prompted the passenger to state that "the only place you can't picket is on the airplanes." (July 24 Tr. 224–225, 230.)

106. Another incident in July involved two IAM strikers who said to a passenger, "If you keep flying Eastern, you're going to die." (July 28 Tr. 1070–1071, 1118.) They also taunted him and threatened: "Come over to the other side of the parking lot, motherfucker, and I will beat your ass." (July 28 Tr. 1118–1119.) On another occasion, also in July, a mother and daughter were visibly crying about the pending operation on the daughter's son in Pittsburgh when picketers at the departure gate told them they should have their dental records for the flight to Pittsburgh. (July 24 Tr. 24, 26–28, 30.) Another picketer made an obscene comment about an employee assisting an elderly passenger in a wheelchair, stating: "Are these two people sucking Lorenzo" and then stated "... why don't you two get on a table and demonstrate." (August 1 Tr. 1143–1144.) A picketer shoved a woman passenger who asked for directions. (August 1 Tr. 1141–1142.) Most recently, a passenger saw the picketers heckling a working pilot and stated to the striker "why don't you leave him alone?" (September 29 Tr. 3215.) The striker called the passenger a "slut" in the presence of her husband which precipitated a confrontation between the husband and the striker. (September 29 Tr. 3215.) Eastern's Regional Manager for Corporate Security, who happened to be present, broke up the confrontation and then asked the police, who were watching the incident, why they had not done anything. They offered no explanation. (September 29 Tr. 3215.)

107. Picketers and strikers also have continually subjected working Eastern employees and persons doing business with Eastern to verbal abuse, intimidation and harassment. They have used profane, provocative and abusive language and gestures intended to provoke a violent response: *e.g.*, "scum bag"; "cocksucker";

"motherfucker"; "Does that bitch belong to you?" [pilot's remark, referring to an employee's wife]; "Hey while you are at work we are having fun with your wife" [remark by IAM striker to Eastern employee]; "fucking whores" [remark by IAM strikers to female employees]; "nigger"; "faggot"; "punk"; "sissy"; "filthy bitch" [remark by flight attendant]; and "knee-pads." One picketer's sign displayed the following: "one scab has died how many more will we miss? None." (July 24 Tr. 100; July 25 Tr. 294, 301, 447–448, 601–602, 607–608, 629; July 27 Tr. 845, 850, 854, 908, 936; July 28 Tr. 1013; August 1 Tr. 1177; August 21 Tr. 2589.) The Atlanta police commander responsible for Hartsfield, Major Shannon, testified that such language is especially inflammatory in a strike situation. (August 7 Tr. 1652–1653.) For example, on July 22, violence resulted from a striker's abusive conduct; a fight broke out during which a striker pulled a knife on a person working for a company that does business with Eastern. (PX 31.) Further, despite the admission by ALPA's picketing supervisor that yelling obscenities at working employees is verbal harassment and that interfering with an individual's ability to do his/her job is also harassment (August 17 Tr. 2423, 2425), ALPA has no program for disciplining its members who violate its own picketing rules, much less the TRO. (August 17 Tr. 2451.)

108. Much of the verbal harassment of Eastern's working employees comes from strikers who are circumventing the picketing rules regarding number and location of pickets by entering the concourse without any picketing signs. (September 29 Tr. 3208, 3215.) They have stationed themselves near the restricted employee entrance in the C–Spine concourse area, which must be used by all flight crews, and when employees walk by the strikers, the strikers chant under their breath "scab," "slut" and other things of that nature. (September 29 Tr. 3208.) When complaints were made to the police about this behavior they responded that since they could not hear the remarks, they would not do anything. (September 29 Tr. 3208.) Members of all three Unions have continually ha-

rassed working Eastern flight crews by blocking the restricted door in the C–Spine concourse area used by them. (July 28 Tr. 1001–1002; September 29 Tr. 3206–3208; PX 59.) One pilot described the approach to the door as "like going through a gauntlet." (July 25 Tr. 290.) This situation is unique to Atlanta where, unlike other airports, the authorities have allowed the picketers to be present within the concourses as well as outside the airport facilities. (September 29 Tr. 3216–3217.) At least one passenger complained to Eastern's Regional Manager for Corporate Security about an incident in which the picketers were harassing a working pilot and questioned why the picketers were allowed to be present within the terminal, commingling with passengers and working employees. (September 29 Tr. 3216–3217.) When questioned, Major Shannon indicated that in his opinion, the number of incidents in the concourse was insufficient to justify moving the picketers. (September 29 Tr. 3230–3231.)

109. The picketers have deliberately acted to provoke violence. On one occasion in September, six strikers, including the General Chairman of the IAM in Atlanta and at least two other IAM members, surrounded Eastern's Regional Manager for Corporate Security, shouting epithets and threatening to injure him. (September 29 Tr. 3198, 3200–3204.) At one point during this confrontation, the General Chairman made a fist and adopted a fighting stance. (September 29 Tr. 3202.) The airport security guards at the scene told the Eastern manager that they were "so afraid" for him that they called the police. (September 29 Tr. 3203.) When the police arrived, the Eastern manager reported the incident, and after attempting to identify the other participants, signed warrants for the arrest of those individuals he was able to identify. (September 29 Tr. 3204.)

110. ALPA and IAM strikers have harassed and obstructed passengers and employees by using observers with video camera to film their presence at boarding gates and on the concourses from as close as two feet. The purported purpose of the observ-

er program is mainly to identify working employees so that they can be brought up on charges and fined by their Unions for crossing a picket line. (August 21 Tr. 2487, 2503, 2553.) Additionally, the observers keep track of aircraft and crew movement. (August 21 Tr. 2485.) They also have filmed employees of companies that do work for Eastern. While the purpose of filming working crews is purportedly for identification only, working Eastern crews have been extensively filmed, despite the fact that their status as working employees is common knowledge. (October 3 Tr. 3305.) Videotape evidence shows harassment of working crews. (August 21 Tr. 2587–2589; PX 10) Additionally, observers have been filming passengers as well causing the passengers to feel intimidated and "violated." (July 24 Tr. 174–176, 180; August 21 Tr. 2513, 2591; PX 3; PX 10.) This filming has been intentionally provocative and intimidating, has interfered with Eastern employees attempting to carry out their duties, and has resulted in physical altercations between filmers and their targets. (August 21 Tr. 2540.) Major Shannon acknowledged that filming at less than 15 to 20 feet from the subject is "threatening." (August 7 Tr. 1683–1684.) Passengers and employees have complained repeatedly about the filming activity but testimony indicates that this behavior continues to occur despite the issuance of the TRO. (July 25 Tr. 378–379; August 1 Tr. 1146; PX 10.) The camera operators have endangered the safety of passengers, including small children, by not watching out for passers-by while they were filming. (July 17 Tr. 73, 77–79, 103, 105–109; PX 2A; PX 3; PX 10; July 24 Tr. 197–198; July 25 Tr. 314, 329–331, 345–346, 363, 378–379, 456, 457, 606–607, 700–702; July 27 Tr. 932–933, 947–948; August 21 Tr. 2577.) At times, as many as six video cameras have been used at one departure gate. (July 24 Tr. 172.) On one occasion, an IAM picketer yanked an Eastern pilot's child away from his mother, pulling the child by the arm in front of the video camera while exclaiming, "Let's get a picture of a scab kid." (July 24 Tr. 103.)

111. On several occasions, these observers have followed flight crews down the concourse despite instructions that they should not engage in this type of behavior. (August 16 Tr. 2289; August 21 Tr. 2560, 2563, 2580; PX 3; PX 10.) Although this came to the Atlanta Strike Chairman's attention (the ALPA official with ultimate responsibility for the observer program, August 21 Tr. 2603; PX 43), while sitting through testimony in Court, he did nothing to insure that this type of behavior would be stopped. (August 16 Tr. 2290.) Further, one observer supervisor stated that if he had received a report about this kind of behavior, he would not do anything. (August 21 Tr. 2565.)

112. Strikers even have harassed working pilots who were trying to obtain weather forecasts at the departure gates. (July 27 Tr. 934.) Striking employees also have trespassed onto FAA-restricted security area. (July 17 Tr. 79–80; July 27 Tr. 929.)

113. Strikers have interfered with the movement of passengers and crew at the airport by turning off the escalators leading up to the concourse. (July 27 Tr. 884–885.) The picketers blocked an electric car in which former Chief Justice Burger and two U.S. deputy marshals were riding. (September 29 Tr. 3205; PX 59.) When one of the marshals instructed the picketers to stand aside, the picketer responded "who do you think you are?" and grabbed the marshal. (September 29 Tr. 3205.) The marshal reported this incident to the Atlanta police, who convinced him not to make a complaint. (September 29 Tr. 3205; PX 59.)

114. Demonstrators have vandalized Eastern property. They have put glue on locks and broken bottles and trash on the curbside baggage conveyor system. They have defecated and urinated on the curbside check-in desk. They have defaced Eastern's property with anti-Lorenzo stickers, for which one striking pilot was cited by the police, though not disciplined by ALPA, and have thrown eggs on the baggage service area at the curb. (July 17 Tr. 83–84; July 27 Tr. 926–927, 939–940, 943; August 14 Tr. 1978–1979; August 17 Tr.

2372–2374, 2431, 2467–2468.) On July 29, on the midnight shift, a striker was found attempting to tamper with the computer terminal behind Eastern's ticket counter. (August 1 Tr. 1145–1146.) Most recently, anti-Lorenzo stickers have been placed on the escalator going down from the central security point and on passengers. (October 3 Tr. 3306–3307, 3367–3368.)

115. At least one business, which has over 12,000 employees and an $8 million travel budget, and which had regularly booked substantial travel on Eastern, has revised its travel policies to allow travelers to fly airlines other than Eastern even when Eastern is the lowest fare. This was as a result of employees' experiences with strikers at Hartsfield while traveling on Eastern. (October 3 Tr. 3269–3271.) Incidents, such as having objects thrown at them while walking through the terminal by a picketer and seeing strikers start a fight with working employees, have made the passengers question their safety while traveling on Eastern. (October 3 Tr. 3269–3270.) Customers also have cancelled flights for fear of reprisals against their business. (July 24 Tr. 208–212.) A travel agent who was present at an April 2 inaugural flight, where picketers from all three Unions were gathered *en masse*, testified, "We have had some problems selling Eastern product to the business traveler since the start-up of operations in April." He explained that "the business traveler has enough headaches without having to impede their normal back and forth [with labor union problems]." Two customers accompanying the travel agent on the inaugural flight changed their mind and did not take the flight, due to commotion at the departure gate. (July 24 Tr. 54, 58, 60–61, 82.)

*Harassment and Interference at the Maintenance Facility and Employee Parking Lot*

116. Strikers deliberately have caused or attempted to cause damage to the property of working Eastern employees, Eastern and its contractors. (PX 59.) Picketers stationed at Tent City, the IAM's headquarters at the airport, are constantly throwing rocks and ball bearings into the maintenance facility, breaking car and bus windows. (July 17 Tr. 88–89; July 27 Tr. 944–945; September 29 Tr. 3229–3230; October 3 Tr. 3311–3318; PX 31; PX 56; PX 59; IAM J17.) Videotaped evidence shows that a striker throwing rocks toward the maintenance facility hangar from Tent City. (PX 56; October 3 Tr. 3311–3318.) Eighteen incidents of nails or property damage, including rocks thrown at cars and trucks, occurred in July alone, and there were 10 incidents of projectiles shot into the hangar or the employee parking lot resulting in several cars sustaining serious damage and the objects narrowly missing working employees in September. (July 27 Tr. 845, 913–916, 941–942; September 29 Tr. 3229; PX 59; IAM J20; *see* PX 5.) One employee at the maintenance facility was struck by a ball bearing projected into the facility. (July 25, 600–601; PX 5; PX 59.) Additionally, there have been increasingly frequent incidents of nails being thrown on the roadway leading to the maintenance facility and employee parking lot. (October 3 Tr. 3317; PX 59.) Nails have been thrown onto the road on a daily basis several times a day. (July 17 Tr. 89; July 27 Tr. 887, 899, 913–916; PX 6.)

117. Strikers also have deliberately caused or attempted to cause physical injury to working employees. Strikers have used Tent City as a staging area to follow working Eastern employees departing in their cars and, in one instance, forced an employee's car off the road. (PX 59.) They have assaulted or threatened employees with physical violence. (July 17 Tr. 90–91; July 25 Tr. 601–603; July 27 Tr. 940–941; September 29 Tr. 3200–3203; PX 59.) Picketers have threatened employees entering the employee parking lot. (July 17 Tr. 87–88; July 24 Tr. 119–120.) They also have physically blocked employees' and non-employees' cars leaving or attempting to enter the parking lot and have paraded in the entrance to that lot, brandishing 2 × 4 lumber. (July 17 Tr. 88; July 25 Tr. 406; July 27 Tr. 846, 848, 887–888, 900, 940–941, 946; IAM J2.) Picketers (including IAM and ALPA members) have

jumped out in front of vehicles attempting to enter and exit the lot, forcing the drivers to stop or swerve to avoid an accident. (July 28 Tr. 1004–1005, 1036.) They also have thrown coffee at cars entering the lot. (IAM J1; IAM J10.)

118. Strikers have acted deliberately to provoke violence. An employee whose car was run off the road confronted the two strikers who had caused the incident and testified credibly that he punched one of them to protect himself. To avoid being followed again, the employee was forced to vary his route home. (July 17 Tr. 88, 91; July 25 Tr. 601–604, 605.)

### Mass Demonstrations

119. On April 2, the day of Eastern's inaugural flight at Atlanta, 200 to 300 IAM, ALPA and TWU picketers demonstrated in the concourse, blocking the check-in desk and the departure gate and chanting loudly, while passengers attempted to board the flight. ALPA's picketing supervisor, responsible for obtaining permits for demonstrations, has admitted that no permit was issued for this demonstration. (August 1 Tr. 1148–1150, 1249, 1256; August 16 Tr. 2283; August 17 Tr. 2348, 2395, 2399, 2440.) The President of the IAM local in Atlanta and the Chairwoman of the TWU local discussed this demonstration before it occurred. (August 14 Tr. 2007.) Officials of the IAM and ALPA participated in this demonstration and acted as spokesmen when talking with the media. In fact, ALPA's instructions to its striking members to wear red ribbons on their uniforms to assist the news media in identifying them as strikers, is further evidence of its approval, and indeed, participation in this event. (August 1 Tr. 1251–1252; August 16 Tr. 2224.)

120. Similar mass demonstrations organized by ALPA, TWU and the IAM were held on April 24, 1989, May 14, 1989 (Mother's Day), and June 14, 1989. (July 17 Tr. 92–93; August 1 Tr. 1152, 1154–1161; PX 10.) On April 24, for which no permit was obtained prior to the rally, (August 16 Tr. 2272; August 17 Tr. 2395), and June 14, ALPA, IAM and TWU members partici- pated in two-hour demonstrations on the sidewalk and roadway in front of the landside terminal. The picketers stood around, blocking the entrance to Eastern's ticket area. The crowd of picketers at the June 14 demonstration was so intimidating that passengers refused to leave the terminal. (August 1 Tr. 1253.)

121. On Friday, June 30, the beginning of the four-day Independence Day holiday weekend, a motorcade of approximately 300 cars entered Hartsfield Airport at 5:30 p.m. and created unprecedented traffic congestion for 60 to 90 minutes. This activity was undertaken despite a request by the City that the location be changed because June 30 was one of the busiest days at the airport. (August 17 Tr. 2408; PX 30.) An ALPA official present at the motorcade admitted that he had never seen traffic backed up as far as it was that day and also admitted that he saw individual cars of ALPA members stopped dead in traffic. (August 17 Tr. 2403–2404.)

122. This Court finds that despite protestations to the contrary (August 17 Tr. 2359, 2401, 2453), this motorcade was clearly organized and orchestrated by the IAM, ALPA and TWU, as evidenced by the messages on the Unions' "code-a-phone" telephone services. As previously stated, these code-a-phone messages are designed as an information source to disseminate reliable and current information on the strike. (August 17 Tr. 2402; PX 43.) The messages on these telephones relating to the June 30 motorcade instructed members, families and sympathizers to arrive at the airport *"precisely"* at 5:30 p.m., ostensibly for a "pledge drive." While at one point in his testimony ALPA's Atlanta strike chairman stated that *he* had initiated changes to the ALPA code-a-phone messages to eliminate the likelihood of a traffic blockade (August 16 Tr. 2252.) Nonetheless, the message still stated that the activities were to begin at 5:30 p.m. (August 16 Tr. 2244–2245, 2251–2253, 2301; ALPA H; ALPA I; ALPA J.) In addition to these messages, at least one Union, ALPA, provided the picketers with petitions which members of the IAM, TWU and ALPA all carried for the "pledge drive." (August 17 Tr. 2462–

2463.) One participant stopped in traffic lanes and exited from his car on the pretext that he was having some mechanical trouble; the person eventually re-entered his car and drove away when police approached. (July 17 Tr. 92–95, 111–116, 134–135; PX 3; July 28 Tr. 1074–1075.) Seven striking pilots were arrested during this demonstration. (August 16 Tr. 2256.)

123. Picketers have continued to congregate *en masse* at Hartsfield. On July 29, 31 picketers stood on the curb blocking the area while several set up lawn chairs on the sidewalk. (August 1 Tr. 1140–1141.) Picketers also have been congregating in unauthorized areas in an attempt to harass working employees (October 3 Tr. 3307–3308; PX 56), and gathering in authorized locations in numbers which exceed the picketing ordinances. (October 3 Tr. 3310–3311; July 24 Tr. 190.)

### The Atlanta Authorities Have Not Controlled The Strikers

124. This Court finds that the record amply demonstrates that the City of Atlanta has adopted an excessively lax view of what constitutes permissible picketing activity and, as a result, has restricted the police as to what they can do to protect Eastern and its property. (July 17 Tr. 136.) Nonetheless, even given these restrictions, the police have not fully exercised the powers available to them to compel the picketers to conduct their activities lawfully.

125. The Commissioner of Aviation, Calvin Carter, has authority to determine the time, place, and manner of picketing, which conditions are set forth in any resulting permit. A key element in determining these conditions is the concern that passengers have free access to the airport and are able to travel as quickly and efficiently as possible within the airport terminal and concourses. (August 7 Tr. 1505–1506, 1602–1603, 1757–1758, 1772.) As passenger use of a concourse increases, Commissioner Carter normally reviews and amends any permit to reflect the increased passenger traffic in that area. (August 7 Tr. 1755–1756.)

126. The Commissioner testified that the City's definition of a picket governed by the picketing permit is an individual with a picket sign. (August 7 Tr. 1532) However, it is clear that in order to gauge the impact of picketing, the Commissioner must consider all strike-related activity, regardless of whether an individual is actually carrying a picket sign or walking the picket line. (August 7 Tr. 1758–1760, 1775.) Consequently, this Court finds that the picketing permit applies to all strike-related activity and is not limited to those persons displaying picket signs. (August 8 Tr. 1808–1812.)

127. The record demonstrates that as the authorized number of picketers increases, so, too, will the number of unauthorized strikers engaging in other strike activity peripheral to the picketing. (August 7 Tr. 1758–1761.) However, it is undisputed that the City authorities do not even count as part of the authorized 162 picketers, the strikers in the terminal who take off their picket signs and engage in other strike activities. (August 7 Tr. 1626–1627.)

128. The Atlanta Police Department has approximately 102 officers assigned to the Hartsfield Airport, of which about 18 to 20 are present on any given shift. In addition, Major Shannon may call on at least 300 additional officers at any time in the event of a crisis. (August 7 Tr. 1627, 1679, 1730.)

129. Concourse C is approximately 2400 feet long. During normal operations it is patrolled by a single officer at all times. Since the IAM commenced its strike, only one additional officer has been assigned to patrol the area. (August 7 Tr. 1675–1676, 1730.)

130. The record makes it abundantly clear that the presence of only two police officers on Concourse C has not been sufficient to prevent the Unions from violating the picketing permit, but the City has not considered increasing the number of officers stationed on that concourse. (August 7 Tr. 1674–1675.)

131. Commissioner Carter first issued a permit to the IAM on February 29, 1988, more than one year before the IAM could legally engage in strike activity under the

RLA. That permit limited to two the number of picketers at enumerated locations inside the landside terminal and on Concourses B and C. In spite of repeated requests from Eastern to meet with Commissioner Carter to discuss the terms of the picketing permit before it was issued, Commissioner Carter refused Eastern's requests. On March 7, 1989, the Commissioner increased to five the permissible number of picketers at those locations, *for a total of 162 picketers*, although in his testimony the Commissioner could not articulate any reason to justify this change. (August 7 Tr. 1482–1483, 1494–1495, 1504–1506; PX 30.)

132. Although the numbers of Eastern flights and passengers have increased dramatically since March 1989, thereby increasing the number of passengers and employees on Eastern's concourses, the Commissioner has not amended the permit to accommodate this increased activity. (August 7 Tr. 1771–1774.) This contravenes the City's stated policy of restricting picketers as airport traffic increases. (August 7 Tr. 1755–1756.) Further, despite the availability of information desks within the concourses for groups to use to communicate with the public, the Commissioner has not restricted the Unions to these facilities. The head of the Airport Station Manager's Association at Hartsfield, a Pan Am employee, testified that, other than picketing, these information desks are usually where this type of strike activity is carried out. (July 24 Tr. 241, 251–252.) Hartsfield, as noted, is unusual in this respect; strikers have been allowed to move freely within the terminal and concourses. The Unions contend that this is necessary because Atlanta is a hub terminal. This Court, however, is unpersuaded by the Unions' assertion.

133. Eastern passengers, at a minimum, must cross a picket line at both their originating airport and again at their final destination. (September 29 Tr. 3216.) In addition, all Eastern employees at Atlanta cross picket lines before they enter the terminal.

(PX 30; September 29 Tr. 3216–3217.) The Commissioner conceded that each and every request by the three Unions to picket or demonstrate against Eastern has been granted, and yet, at the same time, the City persuaded working Eastern employees not to hold a pro-Eastern rally. (August 7 Tr. 1492–1494.) The 162 picketers authorized by the Commissioner far exceeds the number permitted with respect to picketing directed at other airlines. (August 7 Tr. 1580–1582, 1584–1586.)

134. The City of Atlanta has provided the IAM with a central marshalling point in a vacant lot directly across the street from Eastern's airplane maintenance facility. This is the first time the City has granted such a privilege to any organization. (August 7 Tr. 1590–1591.) This area, known as Tent City, is a makeshift headquarters for the IAM. (August 7 Tr. 1588–1589.) As noted earlier, from this installation ball bearings and other objects regularly have been propelled into the maintenance facility and at cars passing by. (July 27 Tr. 913–916; PX 2A; PX 57; PX 59.) Tent City also has been a refuge from which strikers in cars have emerged to tail Eastern employees leaving the premises. Yet the City has refused Eastern's numerous requests to have Tent City moved to any of a number of other available vacant lots. (July 17 Tr. 91–92; July 27 Tr. 949–951; August 7 Tr. 1721–1724; PX 57.) The City's apparent indifference to the safety hazard posed by Tent City and its unreasonable refusal to move it or effectively patrol it are demonstrated by Major Shannon's testimony that he would not move the facility closer to a Delta facility because he was "sure Delta would object." (August 7 Tr. 1723–1724.) This Court finds that the evidence adduced at the hearings does not lend credence to Major Shannon's conclusion that he did not believe the number of incidents was sufficient to justify moving Tent City. (September 29 Tr. 3230–3231.) [8]

135. The IAM, ALPA, and TWU have violated the Airport Commissioner's permit on a daily basis since the strike began on

---

8. This Court has been informed in conjunction with a Hearing held on November 28, 1989 involving conduct of the IAM that the authorities are considering closing down Tent City.

March 4, 1989. (August 7 Tr. 1500, 1512–1513, 1518–1519, 1532–1534, 1611–1612, 1629–1631, 1749–1750, 1777–1779, 1788–1789; PX 29; PX 31.) Despite the Commissioner of Aviation's admission that harassment and safety problems exist as a result of the strikers' activities (PX 58), no effective steps have been taken to prevent these violations from recurring, either by arresting persons, restricting the outstanding permit, or increasing the police presence. The City has been unwilling to do anything to circumscribe the illegal and impermissible activities which have escalated since August. (July 17 Tr. 96; October 3 Tr. 3316; PX 2A–PX 2D; PX 57: PX 58.)

136. The record reveals a consistent pattern of meager or at best lax enforcement of either local law or the picketing permit by the authorities. Police officers have been personally present when strikers have engaged in conduct violating Atlanta ordinances, airport regulations, and the Commissioner's permit, without taking any action to stop such conduct. This Court finds that the officers' failure to react under the circumstances is inappropriate. (August 7 Tr. 1676–1677; 1707–1709; September 29 Tr. 3222; PX 59.) For example, on one occasion when the police were present while picketers blocked passenger access to flights, Major Shannon gave his men directives that the picketers were not to block passengers and restricted the number of picketers and their locations. (September 29 Tr. 3220.) These rules were enforced for two hours. (September 29 Tr. 3220–3221.) When a complaint was made that the rules were no longer being enforced, Eastern was informed that the Commissioner had rescinded the orders. (September 29 Tr. 3221.)

137. The police have done nothing to prevent the escalator to the concourse from being interfered with after the problem was reported to them. (July 27 Tr. 893, 906.) The police also have done nothing to prevent the strikers from constantly violating the picketing rules. (PX 2A; PX 7; PX 8.) They have not tried to stop the strikers from milling about in the customer ticket lines, even when such incidents were reported to them. (July 28 Tr. 983–984; PX 2A.) They have failed to control the numbers of picketers demonstrating in the terminal when too many picketers congregated together. (July 28 Tr. 1018.) Even after the issuance of this Court's TRO, the police witnessed picketers in excess of the number allowed by the picketing rules, yet turned a blind eye. (August 1 Tr. 1140–1141.) Nor have they done anything to prevent strikers from threatening employees entering the parking lot and suddenly stopping in front of and blocking vehicles entering and leaving the lot, even after such incidents were reported to them. (July 28 Tr. 1055–1056, 1094; IAM J11; IAM K15.) The police have done little to prevent or react effectively even when actual acts of violence have occurred. (August 1 Tr. 1142–1143.) For example, an Eastern employee reported to the airport police and the College Park police that after leaving Eastern's maintenance hangar, his car was forced off the road by two strikers and that he fought with one of them. The airport police disclaimed jurisdiction. The College Park police promised to follow up, but did not do so. When the employee visited the police station, the police told him "[they] didn't feel there was going to be any action taken on it." (July 25 Tr. 604–605.) During the entire strike, despite continuing vandalism, harassment, intimidation, endangerment and other picketing abuses by the strikers unrelated to normal picketing, the police have made only a small number of arrests. (July 28 Tr. 1074.)

138. One Eastern customer, who complained to the police about being abused by strikers in Atlanta, was told by the police that they "have no control over the situation." (July 25 Tr. 332.) Another customer complained twice to the Commissioner of Aviation about the defacing of the escalators, walls, and ticket counters with anti-Lorenzo stickers, and about mass picketing in the airport. All he received from the Commissioner was a copy of the permit rules. (July 25 Tr. 690–691, 704–705.) On July 21, 1989, the police were called by Eastern to a departure gate when picketers were upsetting passengers by harassing

working employees. The police officer's only response to the Eastern employees was that "your scab business is up to you." (IAM J4.)

139. In late August, one passenger was so distraught by the picketers' verbal harassment of the working employees, which he could hear while sitting over 100 feet away (October 3 Tr. 3258), that he approached a police officer standing "very close" to the group of strikers and asked why this was allowed to occur. (October 3 Tr. 3256.) The police told him that while they would not do anything to stop the picketers' screams, if he [the passenger] were behaving in a similar fashion he would be stopped. (October 3 Tr. 3256–3257.) This response so angered him that he wrote a letter to the airport authorities to complain about the situation. (October 3 Tr. 3257–3259; PX 54.) Although the Commissioner of Aviation stated in response that such behavior is not approved or condoned (PX 55), no action was taken to prevent this situation from recurring.

140. The police have received complaints about videotaping by the Unions on Concourse C from the beginning of the strike until at least mid-summer. The police concluded that such filming at close proximity is threatening to the subject and, therefore, specifically requested the Unions not to videotape at less than 15 to 20 feet from the subject and to limit the number of cameras on the concourse to two. The evidence received demonstrated that the Unions have not complied with the request, notwithstanding their promise to do so. The police have not arrested anyone violating the request although such conduct violates Atlanta ordinances prohibiting harassment by picketers (August 7 Tr. 1631–1634, 1683–1686, 1689–1696.) and despite the testimony of Major Shannon, the chief law enforcement officer that close proximity filming is threatening to the subject. In spite of numerous written and verbal complaints from passengers and Eastern employees, the authorities have refused to restrict or regulate the use of video cameras on the concourses because they do not consider the camera operators to be engaged in "picketing," which would not be freely permitted there. (July 17 Tr. 135; July 27 Tr. 933; PX 29: IAM J5.)

141. Although nails and ball bearings have been repeatedly thrown into the roadway, a police officer was not even assigned to the employees' parking lot on a 24–hour basis until August 2, 1989. In any case, the police never have arrested anyone or taken any affirmative action to stop this conduct, notwithstanding their presence during a portion of the time, or the fact that it was reported to them, in one instance with a good description of the perpetrator. The continuous nail throwing presents a danger to emergency and law enforcement vehicles that may need to drive on the road. (July 17 Tr. 89–90; July 27 Tr. 888–889, 924–925; July 28 Tr. 1012, 1016–1017; August 7 Tr. 1680–1682, 1699–1702, 1721–1724, 1733–1734; PX 29: PX 31: PX 59.) Despite Eastern's numerous meetings with the Atlanta police about these activities, nothing has been done. (October 3 Tr. 3317–3318.)

142. On occasion, the airport police have acted in partisan fashion fostering harassment and confrontation. For example, in late August, the police stopped all employees entering the maintenance facility parking lot, purportedly to check registration and insurance information, something which never has been done before at the airport. (October 3 Tr. 3319–3320; PX 59.) The cars were stopped directly in front of the picketers, subjecting the drivers of the cars, all women, to verbal harassment from the picketers. (October 3 Tr. 3319–3320; PX 59.) Major Shannon admitted that choosing this location was "bad judgment" on the officers' part. (October 3 Tr. 3320.)

143. Police present at the mass demonstrations on April 2, April 24, and June 14 refused to take action to prevent picketers from blocking the doorways and access road to the Eastern terminal. (August 1 Tr. 1159–1161, 1181–1182, 1223–1224, 1247–1248, 1256; August 17 Tr. 2413.) In fact, the police assisted the demonstrators in blocking the access road when, on April 24, they allowed 400 to 500 picketers to stand in the middle of the road. (August 1 Tr. 1154–1161, 1223–1224; August 16 Tr. 2229;

August 17 Tr. 2410; PX 10.) The City then granted the strikers a permit *after* the demonstration had occurred, as one had not previously been obtained for the demonstration. (August 7 Tr. 1489.) During the June 14 demonstration, the police ignored 50 loudly chanting picketers who surrounded Eastern's Director of Airport Services for 10 to 15 minutes. (PX 2A; August 1 Tr. 1265–1266.)

144. At the June 30 motorcade demonstration, the police were stymied by the strikers' tactics and were unable to prevent traffic from coming to a standstill. (July 17 Tr. 112–115; PX 3.)

145. The police do not arrest persons for misdemeanors committed outside an officer's presence unless the complainant provides a sworn affidavit. (August 7 Tr. 1644–1645.) At an airport, the potential complainants often are about to depart on a flight or reside out of town. Consequently, they are not available to support an arrest warrant (or, ultimately, appear at trial). While this may provide a basis in law for not doing anything to prevent recurring violations by the strikers, it is clear from all the testimony that the City could, but has failed to, impose legitimate restrictions on the time, place, and manner of the strikers' activities, which, if enforced by the police, would severely curtail the recurring unlawful conduct.

146. At times, Atlanta Authorities tolerance of violative acts coupled with minimal enforcement activity have served to encourage rather than restrict or deter illegal activity. At a minimum, the City's conduct has been unreasonable and an abdication of its duty to protect Eastern's employees, Eastern's legitimate interests, and the passenger's safety and right of free travel. The City's conduct also has deprived the traveling public including Eastern's passengers of the ability to peacefully use Eastern's facilities at Hartsfield and has created a threatening environment for Eastern's employees.

*The Strikers' Unlawful Activities Have
Been Authorized Or Ratified By
The Unions*

147. As set forth above, the IAM, ALPA, and TWU have coordinated their activities throughout the strike. Specific unlawful activities (*e.g.,* the June 30 motorcades blocking travelers' access to the airport) have been coordinated and specifically authorized by these Unions, as evidenced by the messages to members on their telephonic bulletin boards.

148. The defendant labor organizations have encouraged, authorized or ratified the intimidation of customers. For example, the IAM's code-a-phone message on July 17 and 18 encouraged its picketers to wear parachutes on their back and a sign saying "I hope you don't need one of these." (August 1 Tr. 1175–1176, 1239–1240.) This tape was made by Robert Taylor, General Chairman for IAM District 100. (August 14 Tr. 1933–1934.)

149. The IAM has appointed "strike captains" and "picket leaders" to supervise strike activities at Hartsfield. These persons were provided copies of the airport rules and are responsible for seeing that the rules are followed. (August 14 Tr. 1871–1872, 1935–1939.) Nonetheless, IAM members have repeatedly violated the airport rules on a daily basis, with no visible attempt at restraint or discipline by the IAM. Thus, whatever the IAM's strike captains and picket leaders may be doing, they clearly will not prevent the IAM's members from engaging in unlawful strike activity. The farcical nature of this "supervision" was clearly displayed by the IAM's General Chairman, who, along with five other strikers, surrounded Eastern's Regional Manager of Corporate Security and threatened to beat him up. (September 29 Tr. 3202.)

150. ALPA has promulgated its own internal rules of conduct for strike activity. (August 15 Tr. 2120, 2173; ALPA A; ALPA U; Px 43.) Many of the activities of ALPA members occurring during the strike against Eastern have violated these internal rules, including restrictions on verbal exchanges, distribution of anti-Lorenzo stickers, and number and location of pickets, among others. (August 15 Tr. 2137, 2152–2153, 2158–2159, 2177, 2181, 2183–

2184, 2185–2186; August 17 Tr. 2372–2374, 2377–2378; August 21 Tr. 2550–2551, 2580; PX 3; PX 10.) ALPA has no provision for disciplining violations of this nature, and accordingly, has not disciplined any of its members for violating its own rules or the City's rules. (August 15 Tr. 2186; August 17 Tr. 2451, 2468.) However, even if there were such a provision, at least one ALPA supervisor admitted he does not know the meaning of certain rules, which he is responsible for enforcing. (August 21 Tr. 2604–2605.) This same ALPA official testified that he has not read the rules promulgated by the City of Atlanta with regard to picketing (August 21 Tr. 2536) and is unfamiliar with ALPA's own picketing rules, which, contrary to the witness' understanding, also apply to observers, the group he is assigned to supervise. (ALPA A; PX 43; August 21 Tr. 2584–2585.) Thus, although ALPA's rules and statements indicate that it is not necessary to violate this Court's TRO in order to carry out its strike activities (August 17 Tr. 2426; ALPA A; ALPA U), numerous violations have occurred.

151. Although ALPA's number one official in charge of the strike activities at Atlanta claimed not to have been alerted to numerous violations by ALPA members engaged in strike activities, he testified that he normally does not "go over to the terminal in the course of [his] duties" (August 16 Tr. 2271, 2282, 2305) and is only in ALPA's field office "every third day." (August 16 Tr. 2270.) Further, the picketing supervisor at Hartsfield has testified that he has been in the airport only once in the last two months, is in his off-site office three to four days a week, and that he has no on-site picketing supervisor. (August 17 Tr. 2360, 2416, 2422.) Additionally, there is no observer supervisor stationed at the airport. (August 21 Tr. 2516.) One observer supervisor testified that he has not been to the airport since the TRO was issued (August 21 Tr. 2530), and has not been getting daily reports on activities at the airport. (August 21 Tr. 2532.) Despite repeated violations by ALPA's strikers, ALPA's Atlanta picketing supervisor has not changed his monitoring practices since

the issuance of the TRO (August 17 Tr. 2449–2450), and one ALPA supervisor stated that if he were presented with a report regarding certain specific violations, he would not take any action. (August 21 Tr. 2565.)

152. Union leaders have been apprised of complaints about strikers' unlawful activities at Hartsfield. Indeed, Union leaders have personally instigated, organized and witnessed such conduct. This Court finds that the testimony by IAM and ALPA officials that they are unaware of the picketers' illegal conduct is not credible. Even if that testimony were accepted at face value, it evidences a studied indifference by the officials, many of whom have admitted to visiting the airport terminal infrequently, if that. (August 16 Tr. 2270–2271, 2282, 2305; August 17 Tr. 2360, 2416, 2422.) Under the circumstances, this Court finds that the leaders must be charged with constructive knowledge of these matters. While the IAM and ALPA witnesses eventually conceded they made no effort to supervise compliance with picketing regulations, the TWU did not even call a witness to rebut Eastern's evidence of its members' conduct and to ensure that the strike is conducted in a peaceful and lawful manner. In so abandoning this duty, the Unions have ratified the violence and unlawful activities.

## F. PICKETING, HARASSMENT AND VANDALISM AT HOMES AND BUSINESSES

153. Although this Court issues the following *Findings of Fact* regarding residential picketing in both Florida and Georgia, this Court is not in a position to consider enjoining such activity pursuant to § 9 of the Norris–LaGuardia Act. *See,* Conclusions of Law, *supra,* at ¶¶ 18–22. However, because the evidence involving the Union's Florida and Georgia residential activates adduced at the hearings is relevant to a determination of the criteria enumerated in 29 U.S.C. § 107 and demonstrates that the Unions acted in concert with one another, this Court makes the following findings regarding these activities:

154. Since commencement of the strike, the IAM, ALPA and TWU Defendants have engaged in, authorized or ratified illegal strike tactics at the homes and businesses of working employees. Examples of these tactics follow.

155. While ALPA officials maintain that ALPA takes no position on residential picketing (August 15 Tr. 2139; August 23 Tr. 2569), it has promulgated oral guidelines to be disseminated to all strike centers where there is to be residential picketing. (August 15 Tr. 2139–2140, 2180.) These guidelines provide that there should be no more than five people picketing, that there is to be no trespassing on the property, no posting of signs on the property and no discussions with family members. (August 15 Tr. 2181.) Additionally, ALPA's First Vice President, Roger Hall, the ALPA national official designated as liaison with the Eastern strike committee (August 15 Tr. 2115, 2117), testified that ALPA also does not want picketers blocking any driveways. (August 15 Tr. 2181.)

156. Despite orders that these guidelines be disseminated and the extensive communication network established by ALPA, including daily scheduled conference calls involving all stations, phone trees, code-a-phone messages, and blocks (August 23 Tr. 2705, 2715), individuals who have engaged in residential picketing claim to be "unaware" of these rules. (August 23 Tr. 2714; August 28 Tr. 2884, 2886, 2906, 2908.)

157. In Atlanta, the strikers have engaged in picketing at Eastern employees' homes so as to intimidate, coerce and interfere with the employees, their families and their property. This residential picketing has been organized by two ALPA blocks at their regularly scheduled Wednesday breakfast meetings. (August 23 Tr. 2624, 1673, 2676.) These blocks were organized by ALPA prior to the strike to facilitate communication with ALPA members, and the ALPA code-a-phone has been used to remind strikers of these meetings. (August 23 Tr. 2624, 2666, 2674, 2713, 2725.) TWU strikers also attend these meetings. (August 23 Tr. 2698.) At least one ALPA official, assistant block leader Benny Doran, participated in the discussions regarding the logistics of the residential picketing in which the group was going to engage. (August 23 Tr. 2623–2624, 2664, 2668.)

158. On July 13, 1989, eleven people, including six pilots in uniform, picketed from 5:00 p.m. to 6:00 p.m. in front of the home of a working Eastern pilot. (August 23 Tr. 2623, 2631, 2677.) This group was comprised of strikers from the two blocks referenced above. (August 23 Tr. 2677.) While the number of picketers was more than two-times greater than called for by the ALPA residential picketing guidelines (August 15 Tr. 2181), that evening, when assistant block leader Doran received a telephone call from ALPA's Atlanta public relations official regarding the picketing, no mention was made that the number exceeded ALPA rules. (August 23 Tr. 2706–2709.) Nor did the ALPA spokesperson request that the pilots refrain from wearing their uniforms while engaging in residential picketing, a situation which even assistant block leader Doran concedes could lead individuals to assume that it was an ALPA-sponsored event, since pilots are required to wear their uniforms when they engage in picketing at the airport. (August 23 Tr. 2710–2711, 2714.) The only apparent reason for the telephone call was to ensure that the picketing participants affirmed ALPA's statement to the media, that it neither condoned nor discouraged residential picketing. (August 23 Tr. 2659, 2706.)

159. On July 17, nine ALPA and TWU members, once again in excess of ALPA guidelines (August 15 Tr. 2181), paraded for approximately one hour across the front yard and driveway of the home of another Atlanta based Eastern pilot, while he was out of town and his wife was home alone. (July 25 Tr. 636; August 23 Tr. 2631, 2640, 2665.) From 5:00 p.m., individuals, including some strikers, drove slowly by the pilot's house for approximately 4 hours in the midst of rush-hour traffic, yelling epithets (August 23 Tr. 2652–2653), and making obscene gestures. At least two individuals drove by waiving IAM picket signs. (August 23 Tr. 2654–2655.) Pick-

eters proclaimed to the pilot's wife that she and her husband "are traitors to God, country and [their] family," and that "[they] are morally and ethically dead," and suggested that they were Nazis by saying "Hitler had Nazis and Lorenzo has scabs." On leaving the property, one picketer taunted, "we will be back." (July 25 Tr. 635–637, 641, 651–652, 657–660; August 23 Tr. 2694.) True to their threat, on July 27, the strikers presumably returned and threw nails into the front yard and driveway, damaging the wheels of the pilot's lawn tractor. Several hours after the nails were cleaned up by the pilot, there were more nails in his yard and driveway. (August 1 Tr. 1144–1145.) Since the picketing, the pilot also has received letters and postcards containing vulgar remarks. (July 25 Tr. 643–645.)

160. Eastern's Director of Airport Services in Atlanta also has had nails thrown in his driveway as recently as late August. These nails are identical to those that have been repeatedly thrown on the road at Hartsfield. (PX 59.) Earlier that same day, the Director's wife received three phone calls in which the party on the line did not respond, although she could hear voices in the background, which she believed were radio transmissions. (PX 59.) Two nights before these incidents, someone rang his doorbell at 11:15 p.m. When he went to the door, no one was there, nor was there any indication that anyone had approached the door. The Director's home, which sits 150 feet off the road, has numerous trees on the property in which individuals could hide. (PX 59.)

161. Additionally, strikers have harassed and intimidated other Eastern employees and their families in Georgia by making obscene or threatening phone calls to employees' homes (e.g., "you are going to lose everything"). (July 25 Tr. 639–641.) One working Eastern pilot received two telephone calls from ALPA strikers who threatened the safety of his children. (July 24 Tr. 105, 106.) He also received calls from strikers which indicated that they are tracking his flights. (July 24 Tr. 107–108.)

162. Despite the fact that this residential picketing was reported in the local newspapers, no one from ALPA called any of the picketers to alert them to violations of the guidelines or to advise them that they should not engage in this type of behavior. (August 23 Tr. 2633, 2677, 2718–2719.) To the contrary, assistant block leader Doran testified that the residential picketing was "a strike activity." (August 23 Tr. 2711.)

163. This Court finds the testimony of ALPA's Atlanta strike chairman and picketing supervisor that ALPA had no involvement with the residential picketing that has taken place in Atlanta (August 16 Tr. 2330, 2335; August 17 2388, 2389) and therefore had not taken any steps to discipline or counsel those pilots involved in residential picketing lacking in credibility. (August 16 Tr. 2332–2333.) The record clearly indicates that in both instances of residential picketing, one ALPA official, assistant block coordinator Doran, participated in the planning of the activities and the picketing itself. (August 23 Tr. 2623–2624, 2664, 2668.)

164. In Miami, ALPA strikers organized and, with the assistance of IAM and TWU members, picketed the homes of two Eastern officials, a working pilot, and on two separate occasions, the unrelated business of two working Eastern employees. (August 28 Tr. 2851–2852, 2861–2862, 2869, 2912, 2922; July 26 Tr. 739, 741–742, 744–746.)

165. Purportedly unaware of the ALPA national Strike Committee's rules on residential picketing, ALPA's Miami spokesperson, Captain Henry Webber, and other ALPA picketers promulgated a separate set of guidelines for residential picketing (PX 47; ALPA CC; August 28 Tr. 2906–07), which were disseminated via a regularly scheduled daily conference call among ALPA officials at all Eastern stations whose strike responsibilities involve public relations. (August 28 Tr. 2885, 2900, 2905–2906.) Unlike the guidelines articulated by Captain Hall, ALPA's First Vice President, these rules did not contain a restriction on the number of picketers allowed to participate in residential picketing. (August 24 Tr. 2818; PX 47.) Despite this, representa-

tives of ALPA's national headquarters and national Strike Committee who regularly participate in these conference calls (August 28 Tr. 2906–2908), as well as ALPA's national spokesperson, defendant Ronald Cole, a defendant herein who also was aware of the picketing (August 28 Tr. 2936), did not advise Webber that residential picketing was not sanctioned by ALPA or that ALPA had guidelines for residential picketing which differed from his own. (August 28 Tr. 2907–2908, 2937.)

166. The ALPA strikers regularly exceeded the national guidelines that limit residential picketing to no more than five picketers. (August 15 Tr. 2181.) ALPA's Miami spokesperson readily admits that there were "only" about fifteen picketers at the home of Frank Causy, Eastern's former Vice President of Flight Operations (August 28 Tr. 2867–2868, 2923), but "a lot" (presumably more than fifteen) at the home of Phil Bakes, Eastern's President. (August 28 Tr. 2867–2868, 2923.) The residential picketing took place between 6:45 a.m. and 9:00 a.m. (August 28 Tr. 2868, 2923.) According to ALPA's Miami spokesperson, residential picketing is done to attract media attention and to make people aware of the strike. (August 28 Tr. 2853; *see also* August 24 Tr. 2815–2817, 2827; PX 47.) To this end, ALPA's Miami spokesperson would notify the media when this type of picketing was planned. (August 28 Tr. 2859.) ALPA strikers specifically picketed early in the morning so that, in addition to the press, they would get maximum exposure to the public during a time when traffic was heaviest. (August 28 Tr. 2859.)

167. In early July, 19 members of ALPA, TWU and IAM picketed the Miami home of one working Eastern pilot who was away at the time, frightening his children, trespassing on his neighbor's property, yelling and acting in a disorderly and intimidating manner. An ALPA pilot made the following threatening remark to the wife of this working Eastern pilot: "Hey, you know, if you didn't have a guard your husband would be dead." (July 26 Tr. 739, 741–742, 744–746.) The harassment and intimidation inflicted on this family of an Eastern pilot has necessitated the contin-

ued use of security guards for protection. (July 26 Tr. 747, 768, 781.) Two days after the picketing, the Eastern security guard at the home was a target of a 10–pound block of cement thrown by an unidentified person. (July 26 Tr. 747.) Additional acts of intimidation and vandalism occurred shortly thereafter, including people driving by and screaming at the home, car windows smashed, rocks and eggs thrown at the house and guard, harassing telephone calls and threatening mail. (July 26 Tr. 747–749.) Prior to the picketing, rocks had been thrown at their bedroom window and a dead animal placed in their yard. (July 26 Tr. 730–733.) Later, on the same day the rock hit the bedroom window, the pilot's wife suffered a miscarriage. (July 26 Tr. 731.)

168. ALPA, TWU and IAM strikers also picketed the Unrelated Florida business of two working Eastern employees, a pilot and flight attendant, on two separate occasions. (July 26 Tr. 798–800, 808, 810–812, 814–815, 821; August 28 Tr. 2859–2860, 2910, 2917, 2921–2922.) On at least one occasion there were twenty picketers, including fifteen striking pilots, at the business, carrying signs and handing out leaflets. (August 28 Tr. 2920–2923.) This picketing, during the business' lunch hours, was designed to occur when the most people would be exposed to the strikers' message, that "this was a scab bar owned by scab people and also that Eastern employees were still on strike." (August 28 Tr. 2866, 2912.) The strikers blocked access to the establishment, stopped customers and deterred others from entering. The business also has received bomb threats, threats of arson and telephone calls threatening to make mincemeat of the pilot and to cut up their 3–year old baby in little pieces and return him in a bag. Additionally, strikers have entered the premises threatening "death to the scab" and nails have been placed in the parking lot of the restaurant on several occasions. (July 26 Tr. 778–788; PX 4A–PX 4F.)

169. Working Eastern pilots and their families residing in Florida have continued to receive abusive, threatening and harass-

ing telephone calls from unidentified persons and from ALPA pilots. (July 26 Tr. 727–728, 738, 748, 761–762, 771–772, 779, 798, 826.) One caller in late March threatened: "[R]est assured we will punish [your husband] and your family" and "You are going to die." (July 26 Tr. 778, 779.)

170. As demonstrated above, this threatening and coercive activity, directed at the homes and businesses of Eastern employees and their families in Florida and Georgia, has been authorized by ALPA and participated in by all three Unions. (July 26 Tr. 767, 773–774.)

## G. ADDITIONAL HARASSMENT AND THREATS

171. IAM, ALPA and TWU representatives have visited travel agents in the Atlanta area to harass those choosing to do business with Eastern. (July 17 Tr. 79; July 24 Tr. 198–199.) ALPA has a specific program to visit travel agencies (August 15 Tr. 2136), and encourages members to visit for the purpose of discouraging bookings on Eastern. In addition to Atlanta, ALPA members have visited travel agents in the New York metropolitan area as well. (August 30 Tr. 2975–2982.) ALPA guidelines for these travel agent visits were sent out by the ALPA National Strike Committee in Herndon, Virginia. (August 16 Tr. 2321–2322; ALPA GG.) One travel agent in Atlanta that sells Eastern tickets has received 40 to 50 harassing "hang up" phone calls a day; she was told that the Union would put them out of business because they sell Eastern tickets. (July 24 Tr. 200–201.) She was visited by an IAM striker and a pilot who asked her not to support Eastern. She testified, "they wanted us to tell the people the planes weren't safe. We said we couldn't do that." On July 20, someone put glue in the door lock of her travel agency. (July 24 tr. 205.)

172. Eastern's Miami pilot recruitment office reported receiving 100 harassing phone calls in May where the caller would let the phone ring and then hang up. After reporting this to the Miami Metro Dade Police Department, a trace was done on subsequent calls (August 28 Tr. 2946;

ALPA FF), which revealed that the calls were coming from the ALPA headquarters on Ponce de Leon Boulevard. (August 28 Tr. 2954; ALPA FF.) This is not surprising in light of the admission by ALPA's Miami spokesperson that there are between thirty and fifty telephones in ALPA's offices and that ALPA neither controls access to, nor monitors, the use of these phones. (August 28 Tr. 2882–2884.)

173. At a pilot recruitment event conducted by Eastern in July at the Doral Country Club and Hotel in Miami, numerous hostile striking employees spit and screamed at two working employees and kicked and surrounded the vehicle which they were in, preventing it from moving. (PX 51.) Although ALPA's Miami spokesperson, who was present at the scene, testified that a passenger in the car pointed a gun at a striker (August 28 Tr. 2949–2950.), the police investigation found no evidence against the working employees and recommended that they be cleared. (PX 51.) One striking ALPA pilot was arrested for disorderly conduct as a result of this incident. (PX 51.)

174. Other incidents, including acts of vandalism, such as throwing nails on the access road and scratching cars with keys, have occurred at the Doral. (PX 51.) The hotel's security director has attributed these acts to the ongoing Eastern labor dispute. (PX 51.)

175. ALPA members piloting U.S. Air and Jetstream International Airlines aircraft have jammed radio communications between Eastern flights and the control tower at Philadelphia International Airport. ALPA leaders have done nothing to investigate this activity or discipline the participants, although jamming is concededly improper under ALPA's rules and potentially very dangerous. (August 15 Tr. 2143–2148.) Similar incidents involving Eastern jets have occurred in Atlanta and New York. (ALPA E.)

## H. PROCEEDINGS IN OTHER JURISDICTIONS

176. On June 30, 1989, Eastern sought a TRO in Georgia state court against many

of the Defendants named herein in anticipation of a "motorcade" planned by the Defendants for that same day at Hartsfield to tie up traffic at the airport facility. The state court did not issue a TRO after receiving assurances that the planned motorcade would not go forward.[9] There were no further proceedings in the Georgia court and Eastern filed a voluntary notice of dismissal on July 18, 1989.

177. Also on June 30, 1989, Eastern commenced an action in Florida state court with respect to the motorcade planned by the Defendants for that day at Miami's airport. Shortly thereafter, Eastern amended the complaint to add a damage claim on behalf of Eastern pilots who were being victimized by ALPA. On July 21, 1989, a second amended complaint was filed, deleting Eastern as a plaintiff and naming instead the affected pilots because of a concern that Eastern had no standing to seek the relief sought.

## I. INJUNCTION NECESSARY

178. IAM, ALPA and TWU Defendants and others acting in concert with them have committed or threatened to commit unlawful acts described herein, or have actually authorized or ratified the same. Moreover, these acts will continue unless enjoined by this Court.

179. Substantial and irreparable injury to Eastern's property will result if these illegal activities are not enjoined and Eastern has no adequate remedy at law.

180. Eastern will suffer irreparable harm if a preliminary injunction is not granted, because money damages cannot adequately compensate for the substantial loss of good will and business which it will continue to suffer if the illegal activities are not enjoined. Denial of preliminary injunctive relief will result in greater injury to Eastern than will be inflicted upon Defendants by granting the relief.

181. The public authorities have been unable or unwilling to furnish adequate protection. In fact, they have failed to take even elementary steps to reduce the violence and threats of violence at both LaGuardia and Hartsfield Airports.

182. Eastern, its creditors, customers and the public have a strong, legitimate interest in the prevention of illegal and tortious conduct designed to disrupt Eastern's flight operations and its business. Granting a preliminary injunction in the present case will further the public interest and benefit the travelling public, Eastern, its employees and its creditors.

183. Eastern has established that it is likely to succeed on the merits of this case. Even if Eastern had not succeeded in demonstrating a likelihood of success on the merits, there are sufficiently serious questions going to the merits to make it a fair ground for litigation.

184. Defendants have ample, powerful means of communicating their message and otherwise engaging in strike-related activity that will not be undercut by an injunction tailored to prohibit their unlawful activities. Moreover, continuation of their illegal activities can only serve to aggravate the present industrial strife and further inhibit prospects for resolution of the dispute.

185. The balance of hardships tips decidedly toward Eastern in that it has clearly demonstrated that the illegal activities of Defendants directed toward Eastern have disrupted Eastern's operations and its business.

## II. CONCLUSIONS OF LAW

1. In the present proceeding, Eastern asks this Court to enjoin unlawful activities engaged in by Defendants. This Court is not required to engage in a substantial and material consideration of "both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce," within the meaning of 28 U.S.C. § 157(d). *See, In re Ionosphere Clubs, Inc. (IAM v. Eastern Air Lines, Inc.),* 103 B.R. 416, 419–20 (S.D.N.Y.1989) (denying the Defendant Unions' motion to

---

9. As noted earlier in the findings, defendants committed numerous unlawful acts on June 30, notwithstanding their assurances to the state court.

withdraw this proceeding to federal district court).

2. As part of its Proposed Findings Of Fact And Conclusions of Law, dated October 16, 1989, ALPA mentions for the first time that the Eastern Master Executive Council ("MEC") and other ALPA Defendants were not served with the Eastern's verified Amended Complaint and the July 17 TRO which was to be served on or before July 19, 1989 as per this Court's order, until July 25 or July 31, 1989. Additionally, as part of its Post–Hearing Supplemental Memorandum Of Law, dated October 24, 1989, ALPA asserts for the first time an affirmative defense concerning late service. However, the October 2, 1989 Answer served by Counsel for all ALPA Defendants, including the Eastern MEC contains no such affirmative defense concerning late service.

█ 4. Lack of personal jurisdiction is waived "by failure [to] assert [it] seasonably, by formal submission in a cause, or by submission through conduct." *Burton v. Northern Dutchess Hospital,* 106 F.R.D. 477, 480 (S.D.N.Y.1985) (quoting *Neirbo Co. v. Bethlehem Shipbuilding Corp.,* 308 U.S. 165, 168, 60 S.Ct. 153, 154, 84 L.Ed. 167 (1939)). *See also, Benveniste v. Eiseman,* 119 F.R.D. 628, 629–30 (S.D.N.Y. 1988). Similarly, the defense of insufficiency of service of process is waived if omitted from the answer. *Pila v. G.R. Leasing & Rental Corp.,* 551 F.2d 941, 942–43 (1st Cir.1977); *Amen v. Dearborn,* 532 F.2d 554, 558 n. 7 (6th Cir.1976). *See, generally,* Fed.R.Civ.P. Rule 12(h)(1).

5. Though subject to a TRO issued July 17, 1989, the Eastern MEC, which has been represented by counsel throughout these proceedings, never once moved to set aside this Court's order by arguing that it was not served in a timely fashion. Nor did Eastern MEC assert an affirmative defense of insufficiency of process or lack of personal jurisdiction in its Answer. Moreover, the Eastern MEC has not asserted nor is this Court persuaded that the Eastern MEC was somehow prejudiced by the untimely service. ALPA's attempt to raise a technical service defense at this late juncture is

hereby rejected given Defendant's undue delay and the obvious prejudice to Eastern. *See, e.g., Benveniste v. Eiseman,* 119 F.R.D. at 629–30; *Burton v. Northern Dutchess Hospital,* 106 F.R.D. at 480–83. *See, generally, Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (amendment to pleadings barred when undue delay and undue prejudice to other side.) Furthermore, the assertion comes *after* the conclusion of the trial of the essential issues in this injunction proceeding rather than at an earlier stage. *See, United States v. Continental Illinois National Bank,* 889 F.2d 1248 (2d Cir. 1989) (consideration of motion to amend pursuant to Fed.R.Civ.P. 15(a) to plead affirmative defense should be liberally construed at earlier stages of a case).

6. This is a core proceeding. Pursuant to 28 U.S.C. § 1334(d), the "district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property of the estate." The district court's jurisdiction has been referred to this Court by the "Standing Order of Referral of Cases to Bankruptcy Judges." dated July 10, 1984 (Ward, Acting C.J.). Thus, bankruptcy courts have jurisdiction to "hear and determine ... all core proceedings ... arising in a case under title 11." 28 U.S.C. § 157(b)(1).

7. This Court's jurisdiction is further defined by 28 U.S.C. § 157(b)(2)(A), which states in pertinent part as follows:

> Core proceedings include, but are not limited to—(A) matters concerning the administration of the estate.

With respect to the administration of the estate, the purpose of the protection provided by Chapter 11 is to give the debtor a breathing spell, an opportunity to rehabilitate its business and to enable the debtor to generate revenue. *See, In re Johns–Manville Corp.,* 801 F.2d 60, 62 (2d Cir. 1986); *In re Talladega Steaks, Inc.,* 50 B.R. 42, 44 (Bankr.N.D.Ala.1985).

8. This Court has previously determined that a debtor has a right to preserve the reorganization process as a whole. *In re Johns–Manville Corp.,* 52 B.R. 879, 890 (Bankr.S.D.N.Y.1985). Other courts also

have recognized that the bankruptcy court has jurisdiction to hear all matters to expeditiously and effectively administer the estate. *See, e.g., In re Wood,* 825 F.2d 90, 92 (5th Cir.1987); *In re Lion Capital Group,* 46 B.R. 850, 856 (Bankr.S.D.N.Y.1985).

9. Eastern's request for an injunction in a labor dispute which is governed by the Norris–LaGuardia Act, 29 U.S.C. §§ 101. *et seq.,* ("Norris–LaGuardia") is a " 'matter [ ] concerning the administration of the estate,' and therefore [is] a core proceeding." *Elsinore Shore Assoc. v. Local 54, Hotel Employees & Restaurant Employees Int'l Union,* 820 F.2d 62, 66 (3d Cir.1987) (quoting 28 U.S.C. § 157(c)(1) (Supp. II 1984)).

10. The filing of a petition in bankruptcy creates an estate that encompasses "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). This provision has been broadly construed. "The scope of [§ 541(a)(1) ] is broad. It includes all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property currently specified in Section 70a of the Bankruptcy Act." *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 2313 n. 9, 76 L.Ed.2d 515 (1983) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), *reprinted in* 1978 U.S.Code Cong.Admin.News 5787, 5868). Hence, this Court has jurisdiction over all of the property of Eastern's estate, wherever located.

11. The paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor. This policy was clearly articulated by the United States Supreme Court in *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which stated: "The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *Id.* at 528, 104 S.Ct. at 1197.

12. In contrast, the policy of the Labor Management Relations Act, 1947, Amended 1959 (29 U.S.C.A. § 141 et seq.), is as follows:

[T]o prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and *peaceful* procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes....

*In re Patrick Cudahy Inc.,* 97 B.R. 489, 491 (Bankr.E.D.Wis.1989) (emphasis added).

13. In this instance, the goals of Chapter 11 and National Labor are not inapposite as they both call for the orderly and peaceful conduct of both parties without interfering with either party's legitimate rights, *i.e.,* the right of the Unions to strike and picket, and the right of Eastern to operate its business.

14. The relationship between Defendants and Eastern is a matter of major importance and the issues raised here of central concern to the administration of the estate. The injunctive relief sought by Eastern is essential to its ability to retain its customers and preserve its ability to operate. Although these goals may be antithetical to the Defendants' desires to "shut down the company," which is a protected right, Defendants' activities are shielded only to the extent that they fall within the protected purview of Norris–LaGuardia. As discussed below, unlawful activity is not so protected.

15. The Norris–LaGuardia Act withdraws from federal courts jurisdiction to enjoin lawful strike activities. Congress passed the Norris–LaGuardia Act to "take the federal courts out of the labor injunction business." *Marine Cooks & Stewards v. Panama S.S. Co.,* 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960). "This congressional purpose ... was prompted by a desire to protect the rights of laboring men to organize and bargain collectively

and to withdraw federal courts from a type of controversy for which many believed they were ill-suited." *Id.* at 369, n. 7, 80 S.Ct. at 783, n. 7.

16. However, "[a] United States Court may in certain instances, issue an injunction in a labor dispute within the constraints of 29 U.S.C. § 107." *In re Warren–Ehret–Linck Co.,* 52 B.R. 47, 49 (Bankr.E.D.Pa.1985); *see also, Boys Markets, Inc. v. Retail Clerks Union, Local,* 398 U.S. 235, 253, 90 S.Ct. 1583, 1593, 26 L.Ed.2d 199 (1970). Section 7 of Norris–LaGuardia states in pertinent part as follows:

> No Court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute ... except after findings of fact by the court, to the effect—(a) That *unlawful acts* have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained ...; (b) That substantial and irreparable injury to complainant's property will follow; (c) That as to each item of relief granted greater injury will be inflicted upon complainants by the denial of relief than will be inflicted upon defendants by the granting of relief; (d) That complainant has no adequate remedy at law; and (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection. (Emphasis added) (29 U.S.C. § 107)

17. Thus, the statute unambiguously allows a federal court to enjoin actions that are not protected therein. A bankruptcy court constitutes a "court of the United States" under this section and consequently, every provision of Norris–LaGuardia is fully applicable to bankruptcy court proceedings. *See, e.g., In re Petrusch,* 667 F.2d 297, 299 (2d Cir.1982), *cert. denied,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1981); *In re Crowe & Assoc., Inc.,* 713 F.2d 211, 214 (6th Cir. 1983).

18. Section 9 of the Norris–LaGuardia Act, 29 U.S.C. § 109, applies "to all 'labor disputes' in which a federal court can issue an injunction." *New York Tel. Co. v. Communications Workers of Am.,* 445 F.2d 39, 49 (2d Cir.1971). Section 109 provides in pertinent part:

> No restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of findings of fact made and filed by the court in the record of the case prior to the issuance of such restraining order or injunction; and every restraining order or injunction ... shall include a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case....

29 U.S.C. § 109.

19. These § 9 limitations "clearly express[ ] a policy that where federal courts can intervene by way of injunction, they must do so hesitantly and avoid blanket prohibition." *New York Telephone,* 445 F.2d at 49. Moreover, "[t]he evident purpose of [§ 9 is] to confine the injunction to the particular acts complained of and found by the Court." *Virginian Ry. System Fed'n No. 40,* 300 U.S. 515, 563, 57 S.Ct. 592, 607, 81 L.Ed. 789 (1937); *New York Telephone,* 445 F.2d at 49; *United States Steel Corp. v. United Mine Workers,* 519 F.2d 1236, 1246 (5th Cir.1975) *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976) (where "no specific act is complained of in the motion ... nor prohibited in the injunction" it "cannot stand" under § 9).

20. Consequently, the only conduct which this Court has or will enjoin are unlawful actions on the part of the Defendants which have been both complained of and substantiated herein.

21. Pursuant to Eastern's Amended Complaint, Eastern seeks relief only with respect to activities occurring at LaGuardia Airport in New York, Hartsfield Airport in Atlanta and other property wherever located. Although Eastern has also presented evidence of certain illegal conduct by the Unions involving residences and family businesses of working employees in Miami and Georgia, Eastern failed to include this

type of activity in its Amended Complaint. Rather, in its Amended Complaint, Eastern's allegations regarding the Defendants' acts of assault against Eastern's officers, agents, representatives, employees, etc. are insufficient pursuant to § 109 to embrace residential picketing as well. Consequently, this Court is precluded from expanding the injunctive relief requested to include this type of activity.

22. However, as stated hereinabove, pursuant to § 9 of the Norris–LaGuardia Act, Eastern's request for injunctive relief regarding residential picketing is outside the scope of this proceeding and cannot be granted. In so holding, this Court does not pass upon whether the residential picketing testified to is an enjoinable activity.

23. Courts have repeatedly stressed that Norris–LaGuardia does not prohibit the issuance of injunctions when it is necessary to enjoin illegal activities. *See, Marine Transport Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*, 770 F.2d 1526, 1530 (11th Cir.1985), *cert. denied*, 475 U.S. 1108, 106 S.Ct. 1514, 89 L.Ed.2d 913 (1986) (may enjoin unlawful acts threatened or committed); *Scott v. Moore*, 680 F.2d 979, 986 (5th Cir.1982), *rev'd on other grounds sub nom. United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (may enjoin intimidation, threats, vandalism and combinations to commit such acts); *Brotherhood of R.R. Trainmen v. Central of Georgia Ry. Co.*, 229 F.2d 901, 905 (5th Cir.1956) (unlawful acts include violence, breach of peace and criminal acts); *United Parcel Service, Inc. v. Int'l Brotherhood of Teamsters*, 421 F.Supp. 452, 458 (D.Mass.1976); *Westinghouse Broadcasting Co. v. Dukakis*, 412 F.Supp. 580, 584 (D.Mass.1976) (may enjoin acts likely to cause violence and verbal harassment of nonviolent but provocative nature); *Potomac Electric Power Co. v. Washington Chapter of CORE*, 209 F.Supp. 559, 560 (D.D.C.1962) (may enjoin commission of crime, sabotage or destruction or injury to property).

24. Although the existing strike is lawful, a union's resort to such tortious

and illegal conduct as violence, threats, intimidation, obstruction and mass picketing, assault, harassment, breach of peace, disorderly conduct and vandalism is not. Such conduct may be enjoined notwithstanding Norris–LaGuardia where, as here, plaintiff meets the requirements set forth in the federal statute. *See*, 29 U.S.C. § 104; *Marine Transport Lines v. Int'l Org. of Masters, Mates & Pilots*, 770 F.2d at 1530; *Scott v. Moore*, 680 F.2d at 985–86; *Brotherhood of R.R. Trainmen v. Central of Georgia Ry. Co.*, 229 F.2d at 905; *United Parcel Service, Inc. v. Local 25, Int'l Bhd. of Teamsters*, 421 F.Supp. at 458; *Westinghouse Broadcasting Co., Inc. v. Dukakis*, 412 F.Supp. at 584; *Potomac Electric Power Company v. Washington Chapter of CORE*, 209 F.Supp. at 560.

25. Defendants' persistent acts of violence, threats, intimidation, harassment, assault, breach of peace, disorderly conduct, destruction of property and other vandalism, obstruction and mass picketing in New York not only have violated New York Port Authority rules, they are illegal under New York law and, as such, enjoinable in that state.

26. Like § 7 of Norris–LaGuardia Act, § 807 of the New York Labor Law expressly places outside the sphere of its protection unlawful acts that cause substantial and irreparable injury to property or breach of the peace, even when incident to lawful picketing. *See*, N.Y.Lab.Law § 807, subd. 1(a) and (b) (McKinney's 1988).

27. New York state courts have repeatedly held that dangerous and illegal acts accompanying a labor dispute may be enjoined. *See, e.g., Rochdale Village, Inc. v. Beverly*, 96 Misc.2d 1080, 410 N.Y.S.2d 508 (Sup.Ct., Queens County 1978); *Nathan's Famous, Inc. v. Joint Bd., AFL–CIO*, 70 Misc.2d 257, 332 N.Y.S.2d 513 (Sup.Ct., Kings County 1972); *Jamestown Sterling Corp. v. United Furniture Workers*, 31 Misc.2d 969, 222 N.Y.S.2d 160 (Sup. Ct., Chautauqua County 1961).

28. In New York, union members are not free to picket when their activity may "lead to violence, disorder or dis-

**940**

regard of the company's property." *Jamestown Sterling,* 222 N.Y.S.2d at 163. Picketing must be "free, not only of violence, but also free of any intimidation, free of any form of physical obstruction or interference." *Triangle Finishing Corp. v. Textile Workers Union of America,* 145 N.Y.S.2d 614, 615 (Sup.Ct., Fulton County 1955); *see generally, Baillis v. Fuchs,* 283 N.Y. 133, 138, 27 N.E.2d 812 (1940) (right to picket not "a shield for violence, disorder and crime"); *Hearn Dep't Stores v. Livingston,* 282 A.D. 480, 125 N.Y.S.2d 187, 190–91 (1st Dep't 1953) (injunction appropriate where picketing accompanied by violence, trespass and express or implied threats and/or intimidation); *Rose Embroidery Corp. v. Freedman,* 281 A.D. 856, 119 N.Y.S.2d 557, 558 (1st Dep't 1953) ("wild screaming, vituperative utterances, threats of physical violence and actual interference with access to plaintiffs' shops" warrants injunction); *Capital Newspapers Div.—Hearst Corp. v. Vanderbilt,* 44 Misc.2d 542, 254 N.Y.S.2d 309, 313–315 (Sup.Ct., Albany County 1964) (employer entitled to injunctive relief where picketing precipitated acts of violence, obstruction, intimidation and breach of peace); *Levine v. Schwimmer,* 201 Misc. 124, 108 N.Y.S.2d 804, 805 (Sup.Ct., N.Y. County 1950) (injunction granted where picketing accompanied by "force, violence, intimidation or the circulation of offensive statements" and where picketing obstructs premises being picketed); *General Electric Co. v. Peterson,* 61 N.Y.S.2d 813 (Sup.Ct., Schenectady County 1946) (mass union action preventing access to plant by non-striking employees, accompanied by threats and intimidation, was illegal, requiring temporary restraining order); *Waldbaum, Inc. v. United Farm Workers,* 87 Misc.2d 267, 284, 383 N.Y.S.2d 957, 970 (Sup.Ct., Queens County 1976) (union enjoined for interfering with lawful operation of plaintiff's business or with entrance-ways to parking lots); *Anaconda Co., Wire & Cable Div., Inc. v. Local 404 Int'l. Union of Elec., Radio and Machine Workers,* 82 Misc.2d 734, 372 N.Y.S.2d 152, 155 (Sup.Ct., Westchester County 1975) (no constitutional right to trespass on the plaintiff's property, obstruct ingress or egress to private property and/or threaten to or commit acts of violence).

29. Defendants' conduct has offended numerous provisions of New York's Penal Law. N.Y. Penal Law §§ 140.05 *et seq.* (unlawful trespass); 120.00 *et seq.* (assault); 240.20 (disorderly conduct); 145.25 (reckless endangerment of property); 240.-25 (harassment); 240.05 (riot); and 240.10 (unlawful assembly) (McKinney's 1988).

30. Similarly, Defendants' acts of violence, threats, harassment, intimidation, assault, breach of peace, destruction of property and other vandalism, disorderly conduct, making harassing telephone calls, obstruction and mass picketing in Georgia not only have violated Defendants' strike permit at Hartsfield International Airport, Atlanta's city ordinances and its airport rules, but Georgia's right to work laws. [*See,* Ga.Code Ann. §§ 34–6–2 (unlawful to prevent or threaten to prevent someone from entering or leaving a place of employment); 34–6–2 (prohibiting attempts to prevent someone from engaging in his vocation by force, intimidation, violence or threats); 34–6–4 (prohibiting attempts to prevent someone from engaging in his vocation by force, intimidation, violence or threats); 34–6–4 (prohibiting attempts to prevent an employer from engaging in business by force, intimidation, violence or threats); 34–6–5 (prohibiting mass picketing that obstructs or interferes with ingress or egress to any place of employment or the free use of public roads and airports); and 34–6–6 (prohibiting threatened interference with individual's family or property so as to compel the person to strike) (1988)].

■ 31. Violations of Georgia's right to work provisions are enjoinable in that state. *Union Camp Corp. v. Savannah Bldg. Trades Council,* 257 Ga. 518, 361 S.E.2d 178, 180 (1987), citing *Fleming v. Terminal Transport Co.,* 222 Ga. 583, 151 S.E.2d 137, 138 (1966).

32. Georgia courts, for example, will enjoin mass picketing (*Fleming,* 151 S.E.2d at 138) and threats of violence force, or intimidation (*Jones v. Van Winkle Gin & Machine Works,* 131 Ga. 336, 62 S.E. 236, 237

(1908); *Pedigo v. Celanese Corp. of America*, 205 Ga. 392, 54 S.E.2d 252, 256, *cert. denied*, 338 U.S. 937, 70 S.Ct. 346, 94 L.Ed. 578 (1949); *Local 3871, United Steel Workers of America v. Fortner*, 202 Ga. 206, 42 S.E.2d 734, 736 (1947); *see, General Teamsters Local Union No. 528 v. Allied Foods, Inc.*, 228 Ga. 479, 186 S.E.2d 527, 529 (1971), *cert. denied*, 405 U.S. 1041, 92 S.Ct. 1313, 31 L.Ed.2d 582 (1972) (injunction bars threatening, assaulting or throwing objects at employees or their vehicles, blocking ingress and egress to plant and congregating near plant with more than two pickets at each entrance)).

33. Defendants' conduct also has violated Georgia criminal statutes such as Ga. Code Ann. §§ 16–5–20 (simple assault); 16–5–23 (simple battery); 16–7–21 (criminal trespass); 16–7–22 and 16–7–23 (property damage); 16–11–30 and 16–11–31 (riot and inciting to riot); 16–11–33 (unlawful assembly); and 16–11–39 (disorderly conduct, inciting breach of peace and telephone harassment) (1988).

34. In their defense, Defendants have argued that entry of an injunction order against their activities may infringe on their constitutional rights under the First Amendment.[10] However, "[t]here is no constitutional privilege to assault or harass an individual or invade another's personal space." *New York State National Organization for Women v. Terry ("New York State NOW")* 886 F.2d 1339, 1343 (2d Cir.1989).

35. Nor does the First Amendment protect " 'fighting' words, ... which by their very utterance inflict injury or tend to incite an immediate breach of the peace."

*Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) ("Appellations 'damned racketeer' and 'damned fascist' are ... likely to provoke ... retaliation, and, thereby, cause a breach of the peace"). *See, e.g., Davenport v. State*, 184 Ga.App. 214, 361 S.E.2d 219 (1987) (conviction for using opprobrious language); *Lynch v. State of Maryland*, 2 Md.App. 546, 236 A.2d 45, 48–49 (Ct.Spec.App.1967) (repeated epithets directed against Black and Jewish minorities), *cert. denied*, 393 U.S. 915, 89 S.Ct. 236, 21 L.Ed.2d 200 (1968); *People v. Beauharnais*, 408 Ill. 512, 97 N.E.2d 343, 346 (1951), *aff'd*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952) (referring to Blacks "as a class possessing various criminal tendencies, unchastity, and degrading sexual inclinations"). *Cf., NLRB v. United Mine Workers*, 195 F.2d 961, 962 (6th Cir.1952), *cert. denied*, 344 U.S. 920, 73 S.Ct. 387, 97 L.Ed. 709 (1953) (mass trespass, high degree of name-calling and verbal abuse expressed overwhelming hostility and other coercive acts carrying threat of violence); *Coopers Int'l Union of North America, Local 42 and Independent Stave Co., Inc.*, 208 N.L.R.B. 175, 85 L.R.R.M. (BNA) 1094, 1974 NLRB Dec. (CCH) ¶ 26, 106 (1974) (" 'hi scabby,' " making an obscene suggestion and stating " 'if this were [my] picket line [I] would bust [you] in the mouth ... Bring your [old man] around and I will bust him in the mouth,' " suggested physical violence, and was not strike rhetoric).

36. Equally important to this proceeding, the First Amendment does not protect free expression views at any time, in any manner, and in any place. *New York State NOW*, 886 F.2d at 1363, citing

---

**10.** This defense was asserted chiefly in response to Eastern's request for a preliminary injunction barring maliciously false statements, recklessly uttered. *Compare, Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 63, 86 S.Ct. 657, 663, 15 L.Ed.2d 582 (1966) ("The malicious utterance of defamatory statements in any form cannot be condoned, and unions should adopt procedures calculated to prevent such abuses.") *with Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 283–84, 94 S.Ct. 2770, 2780–81, 41 L.Ed.2d 745 (1974). Misstatements of fact are not constitutionally protected. *Gertz v. Robert Welch, Inc.*,

418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 *cert. denied* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1974); *see, Cianci v. New Times Pub. Co.*, 639 F.2d 54, 64 (2d Cir.1980); *Hotchner v. Castillo–Puche*, 551 F.2d 910, 913 (2d Cir.), *cert. denied sub nom. Hotchner v. Doubleday & Co.*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). During the evidentiary hearing, however, Eastern agreed to defer, without prejudice, its claim to injunctive relief for false statements, with the permission of the Court and defendants' counsel. (October 4 Tr. 3392–3393.)

*Heffron v. Int'l Soc. for Krishna Consciousness*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). *Cf., Service Employees Int'l Union v. Port Authority of N.Y. and N.J.*, 462 F.Supp. 852 (S.D.N.Y.1978); *Independent Federation of Flight Attendants v. Davis*, 633 F.Supp. 634 (D.Mass.1986); *Nelson v. City of Chicago*, 60 L.R.R.M. (BNA) 2396 (N.D. Ill.1965) (upholding limits on picketing at airports). As the Second Circuit Court of Appeals has most recently reiterated, speech-related activities are subject to reasonable time, place and manner restrictions so long as the limitations are (1) content neutral, (2) narrowly-tailored to meet a significant government interest, and (3) leave open ample alternative means of communication. *New York State NOW*, 886 F.2d at 1363, citing *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *Heffron v. International Society for Krishna Consciousness*, 452 U.S. at 647–48, 101 S.Ct. at 2563–64; *Grayned v. City of Rockford*, 408 U.S. 104, 115–17, 92 S.Ct. 2294, 2302–04, 33 L.Ed.2d 222 (1972).

37. Content-neutral regulations of expression have been defined as those regulations that " 'are *justified* without reference to the content of the regulated speech.' " *New York State NOW*, 866 F.2d 1363 (emphasis in original) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)). "The primary concern of content-neutrality is that no speech or expression of a 'particular content' is 'single[d] out' by the government for better or worse treatment." *New York State NOW*, 886 F.2d at 1363; *see, Virginia State Bd. of Pharmacy*, 425 U.S. at 771, 96 S.Ct. at 1830. "The test is neutrality." *New York State NOW*, 886 F.2d at 1363. The message that the Unions are articulating has not been "singled out for unfavorable treatment. The injunction is not a ban, nor is it a ban masquerading as a limitation. In fact, the order ensures that a forum remain open to Defendants to express their views both to the general public and to those entering or leaving the [airport]." *Id.*

38. "Blocking access to public and private buildings has never been upheld as a proper method of communication in any orderly society." *New York State NOW*, 886 F.2d 1364, citing *Cameron v. Johnson*, 390 U.S. 611, 617, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968); *Cox v. Louisiana*, 379 U.S. 559, 562–64, 85 S.Ct. 476, 479–81, 13 L.Ed.2d 487 (1965); *Cox v. Louisiana*, 379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). There is a significant governmental interest in maintaining public safety and the free flow of traffic at a busy public airport, an interest made all the more compelling by the constitutionally-protected right of citizens to interstate travel, a right assertable against private as well as governmental interference. *See, New York State NOW*, 886 F.2d at 1360, citing, *inter alia*, *United States v. Guest*, 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966); *Griffin v. Breckenridge*, 403 U.S. 88, 105–06, 91 S.Ct. 1790, 1799–1801, 29 L.Ed.2d 338 (1971). The injunction order being issued by this Court is predicated on these principles and a careful balancing of the rights involved.

39. Defendants contend that Eastern has not satisfied § 6 of Norris–La-Guardia Act, 29 U.S.C. § 106, which requires clear proof of the labor organizations' actual participation in, or authorization or ratification of the illegal conduct. As used in § 106, the term "clear proof" means proof that is "clear, convincing, and unambiguous." *Ramsey v. United Mine Workers*, 401 U.S. 302, 311, 91 S.Ct. 658, 664, 28 L.Ed.2d 64 (1971). Moreover, § 106 imposes "special proof requirements" above and beyond those normally required for finding authorization or ratification. *United Mine Workers v. Gibbs*, 383 U.S. 715, 735, 86 S.Ct. 1130, 1143, 16 L.Ed.2d 218 (1966). The mere expression by a union official of sympathy with the purpose of certain acts of union members does not "indicate the desire to ratify the transaction." *United Mine Workers v. Coronado*

*Coal Co.*, 259 U.S. 344, 394, 42 S.Ct. 570, 577, 66 L.Ed. 975 (1922).

40. The "purpose and effect" of § 106 "was to relieve organizations, whether labor or capital ... from ... imputation of guilt for lawless acts done in labor disputes by some individual officers or members ... without clear proof that the organization ... charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of there perpetration." *United Brotherhood of Carpenters & Joiners v. United States*, 330 U.S. 395, 403, 67 S.Ct. 775, 780, 91 L.Ed. 973 (1947).

■ 41. The record amply demonstrates, however, that the IAM, ALPA and TWU Defendants approved, participated in and knowingly tolerated the offending conduct to be enjoined. *See, United Mine Workers v. Gibbs*, 383 U.S. 715, 739, 86 S.Ct. 1130, 1145, 16 L.Ed.2d 218 (1966). The evidence reveals a "definite and substantial connection" between the Unions and the unlawful acts. *See, Ritchie v. United Mine Workers*, 410 F.2d 827, 835 (6th Cir.1969).

42. Additionally, the Unions have participated in and acted in concert with one another with respect to the illegal activities complained of in Eastern's Amended Complaint.

■ 43. The IAM, ALPA and TWU cannot hide behind a purported ignorance of what has happened before their eyes. Under recognized agency law principles, knowledge in possession of an agent, who has a duty to receive or transmit the information, is deemed knowledge in the principal's possession. *In re "Agent Orange" Product Liability Litigation*, 597 F.Supp. 740, 796 (E.D.N.Y.1984). It is immaterial whether the information ultimately was received by the final decision-maker. *In re "Agent Orange"*, 597 F.Supp. at 796. The means of knowledge is ordinarily the equivalent in law to knowledge; when a person has information that would lead a reasonably prudent person to make inquiry, through which he would surely learn certain facts, the person may be found to possess the knowledge he would have had

if he had made that inquiry. *Powell v. Radkins*, 506 F.2d 763, 764 n. 2 (5th Cir. 1975); Devitt and Blackman, 2 *Federal Pattern Jury Practice and Instructions* § 72.06 (3d ed. 1977). Here, the Court rejects, as not credible, the Union's protestations of ignorance and, in any event, the Court is entitled to impute to the Unions actual knowledge under the legal principles just cited.

■ 44. Defendants also argue that Eastern has failed to satisfy the clean hands requirement set forth in § 8 of Norris–LaGuardia Act, 29 U.S.C. § 108, which provides as follows:

> No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute wither by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

29 U.S.C. § 108. Relying on *Brotherhood of R.R. Trainmen v. Toledo P. & W.R.R.* (*"Toledo"*), 321 U.S. 50, 63, 64 S.Ct. 413, 420, 88 L.Ed. 534 (1944), Defendants claim that Eastern's decision not to accept voluntary arbitration, as is its prerogative under the RLA, means Eastern has failed to make every reasonable effort to settle and cannot enjoin Defendants' unlawful conduct, however egregious. The law, however, is not so draconian.

45. It is undisputed that Eastern rejected the National Mediation Board's offer of voluntary arbitration. It is also undisputed that Eastern opposed the NMB recommendation to President Bush that he create a Presidential Emergency Board to issue findings on and facilitate a settlement in this dispute.

■ 46. Norris–LaGuardia was meant to prevent injunctions from upsetting the natural interplay of competing economic forces by stripping unions of their primary weapon, the strike, without providing a reasonable alternative. *Brotherhood of R.R. Trainmen v. Chicago River & Indiana*

*R.R. Co.*, 353 U.S. 30, 40, 41, 77 S.Ct. 635, 640, 641, 1 L.Ed.2d 622 (1957). However, "[t]he Norris–LaGuardia Act has never been construed to bar an injunctive remedy when such relief is necessary to reach important objectives of federal labor law." *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 901 (7th Cir. 1986), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987) (citing *Boys Market, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 251–52, 90 S.Ct. 1583, 1592–93, 26 L.Ed.2d 199 (1970)). "Rather, where parties seek injunctive relief under the RLA, the proper role of the courts is to ensure that the 'obvious purpose' of both the RLA and the Norris–LaGuardia Act is preserved." *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 901. *See, Brotherhood R.R. Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. at 40, 77 S.Ct. at 640; *Chicago & N.W.R. Co. v. United Transp. Union*, 402 U.S. 570, 583, 91 S.Ct. 1731, 1738, 29 L.Ed.2d 187 (1971); *Virginian R. Co. v. System Federation No. 40*, 300 U.S. 515, 563, 57 S.Ct. 592, 606, 81 L.Ed. 789 (1937).

47. Contrary to Defendants' suggestion, courts have rejected a mechanical approach to § 108. Instead, many apply a balancing of the interests of the RLA and Norris–LaGuardia. *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d at 901. *See also, Piedmont Aviation, Inc. v. Air Line Pilots Ass'n Int'l*, 416 F.2d 633, 638 (4th Cir.1969), *cert. denied*, 397 U.S. 926, 90 S.Ct. 924, 25 L.Ed.2d 105 (1970); *Brotherhood of R.R. Trainmen v. Akron and B.B.R.R.*, 385 F.2d 581, 614 (D.C.Cir. 1967), *cert. denied*, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968); *Illinois C.R. Co. v. Brotherhood of Ry. Trainmen*, 398 F.2d 973 (7th Cir.1968); *Cox v. Northwest Airlines, Inc.*, 319 F.Supp. 92, 102–04 (D.Minn.1970).

> [E]ven if the [Union] were correct in contending that the railroad lacked clean hands, Section 8 of the Norris–LaGuardia Act would not of necessity preclude the issuance of an injunction against a strike by the [Union].... It may be that in a particular case the District Court might conclude that the imperatives of the Railway Labor Act override Section 8–a statutory focusing so to speak of an equity approach where-by lack of clean hands may be overcome by a balancing of interests, particularly where it is the public interest involved.

*Air Lines Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d at 901 (quoting *Illinois C.R. Co. v. Brotherhood of Ry. Trainmen*, 398 F.2d at 975–76; *Brotherhood of R.R. Trainmen v. Akron and B.B.R.R.*, 385 F.2d at 614).

48. This balancing comports with the Supreme Court's instruction that the courts should make an "accommodation" between the RLA and Norris–LaGuardia. *Brotherhood R.R. Trainmen v. Chicago River & Indiana R.R.*, 353 U.S. at 42, 77 S.Ct. at 641.

49. Thus, Defendants' reliance on the Supreme Court's decision in *Toledo, supra*, is misplaced. In *Toledo*, the employer's refusal to arbitrate following the abrupt outbreak of World War II, despite governmental urging, and its employment of 29 "special agents" to protect railroad property in a strike of only 100 employees, demonstrates that the employer had failed abysmally to make every "reasonable effort" to settle under the circumstances and was very much to blame for the violence that ensured.

50. Here the balancing of interests tips decidedly in favor of Eastern, its creditors and the traveling public. The "application of Norris–LaGuardia in the instant case would not, as in *Toledo*, clearly foster the purposes behind the Railway Labor Act." *Cox v. Northwest Airlines, Inc.*, 319 F.Supp. at 103–04.

> There the Court balanced the objectives sought to be achieved by Congress through the Railway Labor Act against the private property rights of a single railroad, In this instant case, this Court is faced with more difficult alternatives. It must balance the objectives of the Railway Labor Act that would be furthered by refusing to grant the injunction against others which would be promoted if the injunction was granted.

*Id.* at 104.

51. The activities which Eastern seeks to enjoin include such tortious and illegal

conduct as violence, threats, intimidation, obstruction, mass picketing, assault, harassment, breach of peace, disorderly conduct and vandalism. Thus, precluding Eastern from injunctive relief pursuant to § 8 of the Norris–LaGuardia Act would permit the continuation of these tortious and unlawful acts. In this instance, not only is property of the estate, which is subject to the jurisdiction of the reorganization court (*see*, 11 U.S.C. § 541; 28 U.S.C. § 1334(d)) involved, but also the interest of the traveling public in general. Eastern has made every reasonable effort to settle given its dire financial circumstances, and complied fully with the dispute-resolution requirements of the RLA. Moreover, pre-strike activity by labor forces make it clear that the IAM fully anticipated a strike long before the RLA's collective bargaining procedures were exhausted, and there is no persuasive evidence that the IAM, in fact, was ready to arbitrate had Eastern advised the National Mediation Board it was prepared to do so. Additionally, the President's refusal to appoint a Presidential Emergency Board under the RLA demonstrates a recognition that this dispute was best resolved by the natural interplay of economic forces, *i.e.*, *lawful* strike activity by labor, and economic self-help by management, something both the RLA and Norris–LaGuardia clearly contemplate as an available, acceptable avenue of dispute resolution.[11] To permit *either* side to resort to criminal and tortious misconduct during this natural interplay, without fear of immediate civil redress, subverts the RLA and principles of fundamental fairness, without enhancing the purpose to be served by Norris–LaGuardia. *Cf., Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 386, 89 S.Ct. 1109, 1119, 22 L.Ed.2d 344 (1969) (RLA protects self-help like peaceful picketing but not violent and coercive conduct).

52. As noted earlier, unlawful criminal and tortious conduct has never been considered strike-related activity that is pro-

tected under Norris–LaGuardia. (*See*, Conclusions, ¶¶ 10–14.) Unlike one aimed at prohibiting normally-protected strike action, an injunction here does not strip Defendants of their primary weapon, *i.e.*, their right to strike, or create an imbalance in the natural interplay of competing economic forces. *Cf., Order of R.R. Telegraphers v. Chicago and N.W.R. Co.*, 362 U.S. 330, 338–39, 80 S.Ct. 761, 765–66, 4 L.Ed.2d 774 (1960). It simply assures that the parties will proceed without resort to criminal and tortious conduct, which, if anything, only serves to undercut federal labor law and policy by aggravating industrial strife and delaying resolution of the dispute.

53. The same conclusion would be reached under principles traditionally employed by courts in applying the "clean hands" doctrine. *Cf., Toledo*, 321 U.S. at 60, 64 S.Ct. at 418 (29 U.S.C. § 108 is essentially a clean hands provision). Even if Eastern's refusal to arbitrate were viewed as "bad conduct," the clean hands doctrine only applies when "there is a direct nexus between the bad conduct and the activities sought to be enjoined." *Shondel v. McDermott*, 775 F.2d 859, 869 (7th Cir.1985) (quoting *Int'l Union, Allied Industrial Workers v. Local Union No. 589*, 693 F.2d 666, 672 (7th Cir.1982)). There is no direct nexus here between Eastern's refusal to arbitrate and Defendants' regrettable resort to criminal and tortious misconduct.

54. The Unions contend that Eastern is collaterally estopped from relitigating the ruling of the United States District Court for the Southern District of Florida (the "Florida District Court") that it is barred under § 108 from obtaining injunctive relief. In that suit, Eastern sought an injunction requiring striking ALPA members to return to work. *See, Eastern Air Lines, Inc. v. Air, Line Pilots Ass'n, Int'l*, 710 F.Supp. 1342, 1350 (S.D. Fla.1989), *aff'd*, 89–5229 (11th Cir. June 7, 1989).

---

**11.** It should be noted that subsequent to the conclusion of the trial, President Bush vetoed special legislation passed by Congress calling

for an investigation of both the strike and these bankruptcy proceedings.

55. Under the doctrine of collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980).

56. "Offensive" use of collateral estoppel occurs when a party seeks to foreclose the opposing party from relitigating an issue that the opposing party had previously litigated in another action with a third party. *Parklane Hosiery v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979).

57. Eastern asserts that Defendants have waived any right they might have to assert collateral estoppel. Collateral estoppel is a defense that must be affirmatively pleaded. Rule 8(c), Fed.R.Civ.P. Otherwise, the defense is waived. *See, Evans v. Syracuse City School Dist.*, 704 F.2d 44, 46–48 (2d Cir.1983); *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 172 (5th Cir. 1985); *Allen v. Men's World Outlet, Inc.*, 679 F.Supp. 360, 365 (S.D.N.Y.1988).

58. In this instance, although § 8 of the Norris–LaGuardia Act was an issue raised at the onset of these lengthy proceedings, it was not until testimony was introduced by Eastern at the August 8th Hearing that it should not be precluded from seeking injunctive relief pursuant to § 108 that the Defendants first made reference to the decision by the Florida District Court. However, even at that time, Defendants did not assert that collateral estoppel should apply. (*See*, August 8 Tr. 1817.) Under these circumstances where an extensive record in these proceeding had already been developed, the Defendants' delay in asserting this defense is extremely prejudicial to the Plaintiff. Consequently, the Unions are now precluded from asserting that Eastern is collaterally estopped from litigating the § 108 issue.

59. Even had this Court found that Defendants had not waived this defense, collateral estoppel is inapplicable in this instance because the Florida District Court's discussion of the § 108 issue was not "necessary and essential to the judgment" of that court. *Wickham Contracting Co. v. Bd. of Education*, 715 F.2d 21, 28 (2d Cir. 1983) (quoting *RX Data Corp. v. Department of Social Services*, 684 F.2d 192, 197 (2d Cir.1982)).

60. The issue before the Florida District Court was whether ALPA was engaging in a non-enjoinable legal sympathy strike. In denying Eastern's request for injunctive relief, the court did not hold that Eastern was precluded by § 8 of the Norris–LaGuardia Act from obtaining injunctive relief. Rather, the court's holding that ALPA was, in fact, engaging in a legal sympathy strike was based upon an examination of ALPA's motivation in embarking on a sympathy strike. The court's interjection of the § 108 analysis was merely to "bolster" its finding that ALPA was indeed legally striking in sympathy with the IAM and not in an attempt to further its own separate labor dispute with Eastern. In this regard, the court stated as follows:

> [I]t is likely that ALPA would have joined the IAM strike, even if Eastern had conceded to their section 6 demands.
>
> Bolstering this conclusion is the fact that Eastern failed to take advantage of several possible solutions to the IAM dispute which would have helped maintain the status quo of the concurrent ALPA–Eastern relationship as required under the 'clean hands' provision of the Norris–LaGuardia Act.... These failures by Eastern to promote a resolution of the IAM dispute bolster ALPA's claim that it joined the IAM strike primarily out of distrust and disapproval of the Lorenzo management group and out of long-term concern for the airline.

*Eastern Air Lines v. Air Line Pilots Ass'n Int'l*, 710 F.Supp. at 1350.

61. Thus, it is clear that upon examining the Florida District Court's decision that the court denied Eastern's request for injunctive relief for reasons that had nothing to do with the prohibitive effect of § 108. The conclusion that the ALPA sympathy strike was legal did not depend upon a finding that Eastern had failed to make

every good faith effort to settle the IAM dispute, within the meaning of this section.

62. An injunction is proper in under these circumstance since Eastern has met its burden under the Norris–LaGuardia Act that "the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." 29 U.S.C. § 107(e); *Rochester Tel. Corp. v. Communications Workers of America*, 456 F.2d 1057, 1058 (2d Cir.1972).

63. The traditional standards for granting a preliminary injunction require the party requesting the preliminary relief to show (a) irreparable harm and (b) either likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and (c) balance of hardship tipping decidedly toward the party requesting relief. *See, e.g., Local 553, Transport Workers v. Eastern Air Lines*, 695 F.2d 668, 675 n. 5 (2d Cir.1982); *New York Pathological & X–Ray Labs, Inc. v. Immigration and Naturalization Service*, 523 F.2d 79, 81 (2d Cir.1975); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *In re Feit & Dresler, Inc.*, 760 F.2d 406, 415 (2d Cir.1985); *Abdul Wali v. Coughlin*, 754 F.2d 1015 (2d Cir.1985); *Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 747 F.2d 114, 118 (2d Cir.1984). In cases arising under the RLA, an additional factor of primary concern to the courts is the public interest in the continuation of service. *Long Island Ry. Co. v. IAM*, 709 F.Supp. 376, 388 (S.D. N.Y.1989), *mod. and aff'd*, 874 F.2d 901, 910–11 (2d Cir.1989); *Trans Int'l Airlines, Inc. v. Int'l Brotherhood of Teamsters*, 650 F.2d 949, 967 (9th Cir.1980); *Ozark Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*, 361 F.Supp. 198, 202 (E.D.Mo.1973).

64. Irreparable harm can be found where there is a continuing wrong which cannot be adequately redressed by final relief on the merits. Such harm is often found where money damages cannot provide adequate compensation. *New York Pathological & X–Ray Labs, Inc. v. Immigration and Naturalization Service*, 523 F.2d at 81; *Local Lodge 2144 v. Railway Express Agency, Inc.*, 409 F.2d 312, 316 (2d Cir.1969). Here, Defendants' persistent resort to illegal conduct, directed at Eastern and its employees, contractors, customers and others having business with Eastern, has manifestly caused irreparable harm to Eastern, its operations and goodwill. Moreover, Eastern has shown the requisite likelihood of success on the merits; and the balance of relevant consideration weighs decidedly in favor of granting a preliminary injunction.

65. Additionally, pursuant to § 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "[T]he Bankruptcy Court has authority under § 105 broader than the automatic stay provisions of § 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Chateaugay Corp.* (*LTV Steel Co., Inc. v. Bd. of Education of the Cleveland City School District*), 93 B.R. 26, 29 (S.D. N.Y.1988) (quoting *In re Baldwin–United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985)); *see also, In re Johns–Manville Corp.*, 91 B.R. 225, 227 (Bankr.S.D.N.Y. 1988).

## Conclusion

66. Eastern has satisfied each and every element set forth in § 7 of Norris–La-Guardia Act, 29 U.S.C. § 107. Specifically, this Court concludes as follows:

(i) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained.

(ii) That substantial and irreparable injury will be continued unless restrained.

(iii) That as to each item of relief granted, greater injury will be inflicted upon Eastern by the denial of relief than will be inflicted upon the Unions by the granting of relief.

(iv) That Eastern has no adequate remedy at law.

(v) That the public officers charged with the duty to protect Eastern's property

are unable or unwilling to furnish adequate protection.

(vi) A likelihood of success on the merits on the part of Eastern in establishing the harm to the reorganization was established.

(vii) The balance of hardships tips decidedly in favor of Eastern.

(viii) The injunction would not be adverse to the public interest and, in fact, the issuance of the injunction is in the public interest.

67. Accordingly, a preliminary injunction order shall issue in the form annexed to these findings of fact and conclusions of law. This injunction is tailored to preclude the types of unlawful acts that have occurred; *see, Virginian Ry. Co. v. System Fed'n No. 40,* 300 U.S. 515, 563, 57 S.Ct. 592, 606, 81 L.Ed. 789 (1937); and such variations on this illegal conduct as may be expected to be committed in the future given the powerful evidence of Defendants' wide-ranging violations of law, even in the face of this Court's TRO issued July 17. *See, United Parcel Service (New York), Inc. v. Local 864, International Brotherhood of Teamsters,* 698 F.2d 100, 111 (2d Cir.1983).

The foregoing shall constitute this Court's findings of fact and conclusions of law.[12]

In accordance with the foregoing, an Order has been simultaneously entered.[13]

## PRELIMINARY INJUNCTION ORDER

This cause coming on to be heard on the motion by plaintiff Eastern Air Lines, Inc. ("Eastern") for a preliminary injunction, and notice having been given to concerned parties pursuant to Rules 4(c) and 65, Federal Rules of Civil Procedure, and Defendants having submitted papers in opposition thereto, and this Court having conducted hearings and received testimony beginning on March 22, 1989 and concluding on October 4, 1989, and this Court having is-

sued its Findings of Fact and Conclusions of Law; now, therefore, it is hereby

ORDERED that pursuant to 28 U.S.C. Section 157(b), 11 U.S.C. Section 105(a), Rule 65, Federal Rules of Civil Procedure, and Rule 7065, Bankruptcy Rules, effective during the pendency of this action, Defendants International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM"), IAM District Lodge 100; Local Lodge 1018 of IAM; Local Lodge 1690 of IAM; C.E. Bryan, President and General Chairman, IAM; Leroy Washington, General Chairman, IAM District 100; Peter Voccola, IAM LaGuardia Airport, Acting Chief Shop Steward; A. James Gaetaniello, President, IAM Local Lodge 1018; Robert D. Taylor, General Chairman, IAM District 100; Charles Pica, General Chairman, IAM District 100; Tom Hall, IAM LaGuardia Airport Shop Steward, Julius Scott, IAM LaGuardia Airport Shop Steward; Bruce Sobczak, IAM LaGuardia Airport Shop Steward; James Dunn, IAM Shop Steward; Edward Santini, IAM LaGuardia Airport Chief Shop Steward; Angel Garcia, IAM LaGuardia Airport Shop Steward; Ray Easterby, IAM LaGuardia Airport Shop Steward; John Ciglar, IAM LaGuardia Airport Shop Steward; (collectively the "Defendants/IAM Defendants"), and each of them, their officers, agents, representatives, and successors, and the employees of Eastern represented by them, and all persons acting in concert or participation with them who receive actual notice of this Order, be and hereby are enjoined from permitting, instigating, authorizing, encouraging, participating in, ratifying, approving, directing, threatening, supporting, defending, causing, or assisting any of the following conduct: (i) trespassing unlawfully on the property or premises of Eastern at or near LaGuardia Airport or Hartsfield International Airport; (ii) mass picketing, obstructing, blocking, hindering or otherwise interfering with the ingress or egress of

---

**12.** Any finding that may more properly be considered a conclusion and any conclusion that may more properly be considered a finding shall be so construed.

**13.** It should be noted that a *Report And Recommendation* has been separately issued and filed with the District Court in accordance with Bankruptcy Rule 5011(b) regarding the Unions' request for abstention.

Eastern's officers, agents, representatives, employees, contractors, customers, or others having business with Eastern to and from the property and premises of Eastern or with their free, unrestricted use of all public roads at or near LaGuardia Airport or Hartsfield International Airport; (iii) assaulting, harassing, molesting, intimidating or committing acts of violence, vandalism or destruction of property directed against Eastern's officers agents, representatives, employees, contractors, customers, travel agents, or others having business with Eastern, or threatening to commit any of the foregoing acts, either in person or by telephone, at or near LaGuardia Airport, Hartsfield International Airport or anywhere else; (iv) engaging in disorderly conduct, riot, or breach of the peace directed at Eastern's officers, agents, representatives, employees, contractors, customers, or others having business with Eastern at or near LaGuardia Airport or Hartsfield International Airport, including, without limit, engaging in such conduct by means of shouting, clapping, banging or making other loud or disruptive noises, provided, however, that this is not intended to prevent persons from engaging in reasonably modulated verbal communications of a non-threatening nature; (v) vandalizing, defacing or destroying any of Eastern's facilities, fixtures and other property wherever located; (vi) without permission, putting Anti–Lorenzo stickers on the person or property of Eastern or its customers; (vii) violating the settlement agreement placed on the Court record on April 5, 1989 concerning specified IAM activities; (viii) violating the rules of the New York Port Authority applicable to Defendants' strike-related activities; or (ix) violating the Hartsfield International Airport Commissioner's strike permit, Atlanta city ordinances or Hartsfield International Airport regulations applicable to Defendants' strike-related activities; and it is further

ORDERED, that with respect to Hartsfield International Airport in Atlanta, Georgia, Defendants, their officers, agents, representatives, and successors, and the Eastern employees represented by them, and all those acting in concert or participation with them who receive actual notice of this Order, shall comply with the following restrictions: (i) there shall be no mass demonstrations at entrances or exits or the adjacent sidewalks and roadways located at the north landside terminal; (ii) any and all strike-related activity within any terminal building at Hartsfield International Airport shall be conducted by no more than two persons located at an information desk made available on both the B and C concourses; (iii) the location known as Tent City shall not be occupied or used for any strike-related activities and any new location established as a base for Defendants shall be sufficiently distant from Eastern's maintenance facility so as to prevent objects from being projected from the new location into Eastern's facility; (iv) no strike-related activities shall take place on the roadway leading to or from Eastern's employee parking lot or its hangar maintenance facility; and (v) there shall be no shouting, banging, clapping or other loud or disruptive noises made in connection with strike-related activities at Hartsfield International Airport, provided, however, that this is not intended to prevent persons from engaging in reasonably modulated verbal communication of a non-threatening nature; and it is further

ORDERED, that with respect to LaGuardia Airport in Queens, New York, Defendants, their officers, agent, representatives, successors and the Eastern employees represented by them, and all those acting in concert or participation with them who receive actual notice of this Order shall comply with the following restrictions: (i) the picket line at the Central Terminal's departure area (the upper level) shall be located at least 40 feet to the east of Eastern's terminal entrance; (ii) consistent with the current authorization of the New York Port Authority, the maximum number of picketers located at this departure area shall be 12; (iii) the picket line at the Central Terminal's arrival area (the lower level) shall be located at least 20 feet from Eastern's baggage claim area exit; (iv) consistent with the current authorization of the New York Port Authority, the

maximum number of picketers located at this arrival area shall be 12; (v) any and all strike-related activity within the Central Terminal shall be conducted by no more than two persons located at the information desk made available by the New York Port Authority; (vi) there shall be no mass demonstrations at entrances or exits, or the adjacent sidewalks and roadways located at the Central Terminal; (vii) there shall be no shouting, banging, clapping or other loud or disruptive noises made in connection with strike-related activities at LaGuardia Airport or at the nearby Marriott Hotel, provided, however, that this is not intended to prevent persons from engaging in reasonably modulated verbal communication of a non-threatening nature; and it is further

ORDERED, that nothing in this Order shall be construed to infringe on Defendants' rights under the First Amendment to the United States Constitution or any rights protected by the Norris–LaGuardia Act, 29 U.S.C. Section 101, *et seq.;* and it is further

ORDERED that nothing in this Order shall be construed to limit the authority or obligation of the New York Port Authority Police, the Atlanta Police Department or any other lawful public authority from enforcing all laws, rules and regulations for which they normally bear responsibility; and it is further

ORDERED, that the Defendants, their officers, agents, representatives, successors and the Eastern employees represented by them, and all those acting in concert or participation with them who receive actual notice of this Order, shall take all steps within their power to prevent commissions of the foregoing conduct prohibited by this Preliminary Injunction Order, and to stop them from continuing to do so if commenced; and it is further

ORDERED, that:

a. within 24 hours after entry of this Order, the Defendant labor organizations shall mail a copy of the order to each of their members employed by Eastern, together with a letter in the form annexed as Exhibit A; and promptly thereafter, the Defendant labor organizations shall file with the Court proof that such mailing was made;

b. a copy of the Preliminary Injunction Order shall be posted on all union bulletin boards at all union headquarters and shall be distributed at all other locations where union members may gather for union business; and it is further

ORDERED, that the Defendants, their officers, agents, representatives, and employees represented by them, and all those acting in concert or participation with them who receive actual notice of the Order, shall direct all Eastern employees represented by the Defendant IAM to refrain from engaging in any acts prohibited by this Preliminary Injunction Order and shall communicate the dictates of this Order by:

a. rescinding and withdrawing any orders, directions, requests or suggestions previously issued by them or under their authority to employees of Eastern that any such employees engage in any acts prohibited hereby;

b. posting on all union bulletin boards maintained at all union offices, the following signed notice:

To: All Eastern employees represented by the IAM

From: the IAM

You are prohibited by a Preliminary Injunction Order of the United States Bankruptcy Court for the Southern District of New York from participating in specified acts that include violence, threats, assault, intimidation, mass picketing, trespass, harassment, obstruction, disorderly conduct, disturbing the peace, vandalism, defacing or destroying property, and residential picketing, whether directed at Eastern Air Lines, Inc., or its officers, agents, representatives, employees, contractors, customers, or others having business with Eastern. Any previous statement to the contrary is hereby cancelled.

c. In response to any inquiry from any union member concerning the effect of this Order on strike-related activities against Eastern, referring such members to this

Preliminary Injunction Order and telling them that he or she is expected by the union to comply may result in a finding of contempt as well as the imposition of union discipline; and it is further

ORDERED that the failure to comply with this Order by any Defendant or any person with actual notice of the provisions of this Order may subject him or her to civil or criminal contempt sanctions, including possible fines or imprisonment; and it is further

ORDERED, that Eastern's request for a preliminary injunction to enjoin residential picketing in the states of Georgia and Florida is hereby denied pursuant to § 9 of the Norris–LaGuardia Act; and it is further

ORDERED, that this Preliminary Injunction order is issued on the condition that the previously issued bond or cash equivalent in the sum of $150,000 shall continue to be maintained by Eastern and Defendants shall recover from Eastern under the said bond or cash equivalent the costs and damages, if any, suffered by them in the event this order was issued improvidently.

EXHIBIT A

ˈNovember    , 1989

Dear Sister or Brother:

On November ___, 1989, after an extended evidentiary hearing, the United States Bankruptcy Court for the Southern District of New York entered the enclosed Preliminary Injunction Order against our Union and its members which, among other things, requires service of a copy of the Order upon each of you. Each of you, the Union, its officers, and any other persons associated with the Union, must strictly comply with the requirements of the Order. We are all required to do so by law, and will all be harmed if we fail to obey.

A violation of the Preliminary Injunction Order will have far-reaching consequences. An adjudication of contempt of Court, on the part of any person or organization violating the Order, may lead to fines and imprisonment. In addition, anyone who violates the Order may be subject to discipline by the Union. Consequently, the Un-

ion is emphasizing in the strongest possible terms that you should abide by the Order. You are urged to read the enclosed Order carefully, to familiarize yourself with its terms and to obey those terms. Thank you for your support.

Fraternally yours,